**<u>EXHIBITS</u>**

**<u>EXHIBIT A</u>**:      USLIPOL000001-26 – USLI 2021 Policy No. EPL1559591E

**<u>EXHIBIT B</u>**:      Declaration of Kevin Brown

**<u>EXHIBIT C</u>**:      USLIPOL000027-52 – USLI 2022 Policy No. EPL1559591E

**<u>EXHIBIT D</u>**:      Complaint

**<u>EXHIBIT E</u>**:      First Amended Complaint

**<u>EXHIBIT F</u>**:      Docket CV2021-013286

**<u>EXHIBIT G</u>**:      USLI000229-231 – 4.11.22 Resp Letter to Denial

**<u>EXHIBIT H</u>**:      USLI000225-228 – Denial of Coverage Letter

EXHIBIT "A"

EPL1559591D
Renewal of Number

**United States Liability Insurance Company**
**1190 Devon Park Drive, Wayne, Pennsylvania 19087**
A Member Company of United States Liability Insurance Group

Home Office Copy
Direct Bill Policy

**POLICY DECLARATIONS**

## No. EPL1559591E

NAMED INSURED AND ADDRESS:

**USA TRUCK CENTER, LLC**
**C/O RAJ PATEL**
**9831 S 51ST ST SUITE D134**
**PHOENIX, AZ 85044**

POLICY PERIOD: (MO. DAY YR.)   From:  01/08/2021  To:  01/08/2022

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

PREMIUM

Employment Practices Liability Insurance

**TOTAL:**

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue

**See Endorsement EOD (1/95)**

Agent:   **LEAVITT GROUP AGENCY ASSOCIATION (2476)**
**PO Box 160**
**Cedar City, UT  84720**

Issued:  **01/07/2021 1:07 PM**

Broker:   Farmer Woods Group
919 North 1st STreet
Phoenix, AZ  85004

By:  _Thomas P. Nerney_
Authorized Representative

UPD (08-07)

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.**

USLIPOL000001

# EXTENSION OF DECLARATIONS

**Policy No. EPL1559591E**

Effective Date:   **01/08/2021**

12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

## FORMS AND ENDORSEMENTS

**The following forms apply to the policy**

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| EPL-108 | 09/07 | Expanded Definition Of Organization Endorsement |
| EPL-122 | 06/09 | Franchisor Exclusion |
| EPL-144 | 09/07 | Third Party Coverage Endorsement |
| EPL-148 | 09/07 | Retroactive Date Endorsement |
| EPL-162 | 05/10 | Fair Labor Standards Act Sub-Limit Endorsement |
| EPL-167 | 05/09 | Amended Definition Of Loss Endorsement |
| EPL-169 | 11/13 | Amended Notice/Claim And Circumstance Reporting Provisions |
| EPL-AZ | 09/07 | Arizona State Amendatory Endorsement |
| EPL-J | 09/07 | Employment Practices Liability Insurance Policy |
| JACKET AZ | 07-19 | Policy Jacket |

EOD (01/95)          All other terms and conditions remain unchanged.          Page   1   of   1

**USLIPOL000002**

**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS**

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**NOTICE: DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**No.  EPL1559591E**                                   Effective Date:  **01/08/2021**

                                                                        12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

**USA TRUCK CENTER, LLC
C/O RAJ PATEL
9831 S 51ST ST SUITE D134
PHOENIX, AZ 85044**

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  01/08/2021  To:  01/08/2022

## Employment Practices Liability

| | | |
|---|---|---|
| ITEM III. LIMITS OF LIABILITY | **$500,000** | EACH CLAIM |
| | **$500,000** | IN THE AGGREGATE |
| ITEM IV. RETENTION: | **$2,500** | EACH CLAIM |
| ITEM V. PREMIUM: | **$10,069** | |
| ITEM VI. RETROACTIVE DATE: | **01/08/2016** | |
| ITEM VII. CO-INSURANCE: | **0.00%** | |

ITEM VIII. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
   **See Endorsement EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

USLIPOL000003

**This page has been intentionally left blank.**

USLIPOL000004

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

---

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

---

## EXPANDED DEFINITION OF ORGANIZATION ENDORSEMENT

It is hereby agreed that Section III. DEFINITIONS, L. "**Organization**" is amended to include the following:

Green Fili, LLC

Jay Sibal Shushi Investments, LLC

Best Sub, LLC

G-Valley, LLC

Lake Havasu City LHC, LLC

Invest Group, LLC

All other terms and conditions of this policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown.

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

# FRANCHISOR EXCLUSION

It is hereby agreed that the **Company** shall not be liable to make any payment for **Loss** or **Defense Costs** based upon, arising out of, directly or indirectly resulting from or in consequence of any **Claim**:

1. Brought against any **Insured** by any current or former **Franchisor** or any other current or former franchisee of a **Franchisor**;

2. Brought against any **Insured** based solely on the acts or omissions of a current or former **Franchisor** or any other current or former franchisee(s) of a **Franchisor**; or

3. Brought against any **Insured** as a class action lawsuit, whether certified or not, based in whole or in part on**:**

   a. the **Insured's** franchise relationship with any current or former F**ranchisor**;

   b. the acts or omissions of a current or former **Franchisor**; or

   c. the acts or omissions of any other current or former franchisee(s) of a **Franchisor**.

For the purpose of this endorsement:

"**Franchisor**" means a person or entity with whom or for whom any **Insured** operates a franchise under any form of franchise agreement.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

USLIPOL000006

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## THIRD PARTY COVERAGE ENDORSEMENT

Section III. DEFINITIONS, R. "**Wrongful Act**", is amended to add the following paragraph:

**Wrongful Act** shall also include any actual or alleged act of:

(1) **Third Party Discrimination;** or
(2) **Third Party Harassment.**

Section III. DEFINITIONS, is amended to add the following**:**

T. "**Third Party**" means any person(s) with whom an **Insured** in their capacity as such interacts while the **Insured** is performing duties related to the conduct of the **Organization's** business.

U. "**Third Party Discrimination**" means discrimination by an **Insured**, in their capacity as such, against a **Third Party** based upon such **Third Party**'s race, religion, age, sex, disability, national origin, sexual orientation or other protected class or characteristic established under applicable federal, state or local statute or ordinance while the **Insured** is performing duties related to the conduct of the **Organization's** business.

V. "**Third Party Harassment**" means; sexual harassment including any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature against a **Third Party,** or other harassment which creates an environment that is hostile, intimidating or offensive to a **Third Party;**

committed or allegedly committed by an **Insured** in their capacity as such while the **Insured** is performing duties related to the conduct of the **Organization's** business.  **Third Party Harassment** shall not include sexual abuse or molestation.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

EPL 144 (09-07)                                                                                   Page 1 of 1

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

---

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

---

## RETROACTIVE DATE ENDORSEMENT

It is hereby agreed that section II. FULL PRIOR ACTS COVERAGE PROVISION is deleted and replaced with the following:

Coverage shall apply to any **Claim** made against the **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of the cancellation or nonrenewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable.

However, coverage shall not apply to any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Wrongful Act** committed or alleged to have been committed prior to 01/08/2016.

Coverage shall also not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge, or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

A.   the inception date of this Policy; or

B.   the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

USLIPOL000008

### UNITED STATES LIABILITY INSURANCE GROUP
### WAYNE, PENNSYLVANIA

> This endorsement modifies insurance provided under the following:
>
> **EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## FAIR LABOR STANDARDS ACT SUB-LIMIT ENDORSEMENT

It is agreed that

I. INSURING AGREEMENT is amended by addition of the following:

**C.** The **Company** will pay on behalf of the **Insured** a sub-limit of liability of $100,000 in excess of the Retention for all **Loss** and **Defense Costs** combined that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, for any actual or alleged violation of the federal Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act including misclassification of or misrepresentation to **Employees** under these laws.  This sub-limit does not apply to or restrict the Limit of Liability described in **A.** above, for **Claims** alleging violations of the Equal Pay Act.

III. DEFINITIONS, R. "**Wrongful Act**", is amended to add the following

**(10)** violation of the federal Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act;

IV. EXCLUSIONS, **B.(9)**, is deleted in its entirety for purposes of coverage provided by this endorsement only.

V. LIMITS OF LIABILITY AND RETENTION is amended by addition of the following:

The $100,000 Sub-Limit of Liability for an actual or alleged violation of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act shall be a part of and not in addition to the Limit specified in the Policy Declarations.  **Defense Costs** for **Claims** arising out of an actual or alleged violation of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act shall be included within the $100,000 Sub-Limit of Liability set forth in this endorsement.  The $100,000 Sub-Limit of Liability shall be the maximum liability for **Loss** and **Defense Costs** from all **Claims** for actual or alleged violations of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or

local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act.

VIII. DEFENSE AND SETTLEMENT, **B.**, is amended by addition of the following:

However, in the case of a **Claim** involving an actual or alleged violation of the Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act, the **Company** will pay **Defense Costs** until such time as the $100,000 Sub-Limit of Liability provided by INSURING AGREEMENT, **C.**, is exhausted by payment of **Loss** and/or **Defense Costs** applicable to actual or alleged violations of the Fair Labor Standards Act, any amendments thereto or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act  at which point the **Company** shall have no further duty to defend such **Claim**.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown.

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

---

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

---

## AMENDED DEFINITION OF LOSS ENDORSEMENT

It is hereby agreed that Section III. DEFINITIONS is amended by deleting paragraph **K**. and replacing it with the following:

**K.** "**Loss**" means damages, settlements, front pay, back pay, and pre-judgment and post-judgment interest awarded by a court.

**Loss** also includes:

(1) punitive and exemplary damages;

(2) liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, and the Fair Labor Standards Act (if endorsement EPL-162 is endorsed to this policy), all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local law, statute or regulation; and

(3) the multiplied portion of any multiplied damage award

to the extent such damages are insurable under applicable law, statute or regulation.

For the purpose of determining the insurability of punitive, exemplary or liquidated damages or the multiplied portion of any multiplied damage award, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

**Loss** does not include:

(1) fines, penalties and taxes;

(2) monetary sanctions that are uninsurable by operation of law;

(3) an express obligation to make payment in the event of the termination of employment.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

USLIPOL000011

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## Amended Notice/Claim And Circumstance Reporting Provisions

It is agreed:

I. INSURING AGREEMENT is deleted in its entirety and replaced by:

    **A.**  The **Company** will pay on behalf of the **Insured**, **Loss** in excess of the Retention not exceeding the Limit of Liability shown on the policy Declarations for which this coverage applies that the **Insured** shall become legally obligated to pay because of Claims first made against the **Insured** during the **Policy Period** or during any Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization**. Such **Claim** must be reported to the Company in accordance with Section IX herein.

    **B.**  The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent.

II. FULL PRIOR ACTS COVERAGE PROVISION is deleted in its entirely and replaced by:

    Coverage shall apply to any **Claim** made against an **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of cancellation or non-renewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable. Such **Claim** must be reported to the Company in accordance with Section IX herein.

    However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

        **A.**  the inception date of this Policy; or

        **B**.  the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

VII. EXTENDED REPORTING PERIOD is deleted in its entirety and replaced by:

    **A.**  If the policy expires, is cancelled or non-renewed for any reason other than non-payment of premium, the **Parent Organization** shall have the right to purchase an Extended Reporting Period to report to the **Company** as soon as practicable during the Extended Reporting Period any **Claim (s)** being first made against an **Insured** during the twelve (12) months, or twenty-four (24) months or  thirty six (36) months after the effective date of such

USLIPOL000012

expiration, non-renewal or cancellation (depending upon the Extended Reporting Period purchased,). For the purpose of this section, any change in premium terms or terms on renewal shall not constitute a refusal to renew.  An Extended Reporting Period shall only apply to a **Claim** arising from a **Wrongful Act** which was committed before the date of such expiration, cancellation or non-renewal.

**B.** The additional premium for the Extended Reporting Period shall be 50% of the annual premium set forth in the Policy Declarations for the twelve (12) month period; 100% of the annual premium set forth in the Policy Declarations for the twenty-four (24) month period; or 150% of the annual premium set forth in the Policy Declarations for the thirty-six (36) month period. The Extended Reporting Period begins on the expiration date or the effective date of cancellation or non-renewal of the policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium due above no later than thirty (30) days after the effective date of such expiration, cancellation or non-renewal.

**C.** All premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.

**D.** The Limits of Liability available during the Extended Reporting Period shall not exceed the balance of the Limits of Liability available on the expiration date or effective date of cancellation or non-renewal of the policy.

**E.** Coverage for a **Claim** first received and reported during the Extended Reporting Period shall be excess over any other valid and collectible insurance providing coverage for such **Claim.**

IX. NOTICE/CLAIM AND CIRCUMSTANCE REPORTING PROVISIONS is deleted in its entirety and replaced by:

Notice hereunder shall be given in writing to the **Company**.  If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

**A.  Written Notice of a Claim:**

**(1)** As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim,** as soon as practicable but:

**(a)** if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an **Insured** prior to the Policy expiration or effective date of cancellation or non-renewal; or

**(b)** if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period;

USLIPOL000013

provided that if the **Company** sends written notice to the **Parent Organization** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the **Company** written notice of such **Claim** prior to the effective date of such termination.

**(2)** If an Extended Reporting Period is purchased, notice of **Claim** shall be in accordance with the terms and conditions of Section VII. EXTENDED REPORTING PERIOD.

**B.  Written Notice of a Circumstance:**

**(1)** An **Insured** shall give to the **Company** written notice of a circumstance which could reasonably be expected to give rise to a **Claim** being made against an **Insured** as soon as practicable during the **Policy Period** in which an **Insured** first becomes aware of the circumstance.

**(2)** If written notice of a circumstance which could reasonably be expected to give rise to a **Claim** being made against an **Insured** has been given to the **Company** during the **Policy Period**, any **Claim** which is subsequently made against an **Insured** and reported to the **Company** alleging, arising out of, based upon, or attributable to the facts set forth in the reported circumstance shall be considered to have been first made at the time such notice of the circumstance was given.  Coverage for a circumstance reported pursuant to this provision applies only if the **Wrongful Act** that is the subject of the reported circumstance occurs prior to the expiration date or if applicable, prior to the effective date of cancellation or non-renewal of the **Policy Period** in which the circumstance was reported.

**(3)** When reporting a circumstance to the **Company**, an **Insured** shall give the reasons for anticipating why the circumstance could reasonably be expected to give rise to a **Claim** being made against an **Insured** with full particulars as to the dates and persons involved.

All other terms and conditions of this Policy remain unchanged.  This endorsement is part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown**.**

USLIPOL000014

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## ARIZONA STATE AMENDATORY ENDORSEMENT

To be attached to and form a part of all Employment Practices Liability policies written in the state of Arizona.

It is hereby agreed that Section III. DEFINITIONS, is amended to include the following:

T. "**Retroactive Date**" is the date stated in Item VI. of the Policy Declarations for which any **Wrongful Act** occurring prior to that date is excluded from coverage for **Loss** and **Defense Costs** even if the **Claim** is first made during the **Policy Period**.

It is further agreed that Section X. CANCELLATION OR NON-RENEWAL, is amended to add the following:

F. If one of the following occur, the **Company** is not required to provide written notice of non-renewal:

(1) The **Company** or a **Company** within the same insurance group has offered to issue a renewal policy; or

(2) The **Insured** obtained replacement coverage or agreed in writing to replace coverage

G. If the **Company** elects to renew this Policy and the renewal is subject to any of the following:

(1) Increase in premium;

(2) Change in deductible;

(3) Reduction in Limits of Liability; or

(4) Substantial reduction in coverage;

the **Company** is required to provide written notice to the **Parent Organization**. If the **Company** fails to provide written notice sixty (60) days prior to the anniversary or expiration date of this Policy, the following procedures apply:

(1) The current Policy will remain in effect until the earlier of the following:

a. Sixty (60) days after the date of mailing or delivery of the notice; or

b. The effective date of replacement coverage obtained by the **Parent Organization**

(2) If the **Parent Organization** accepts the renewal, the premium increase, if any, and other changes are effective the day following this Policy anniversary or expiration date.

All other terms and conditions of this policy remain unchanged. This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

| Employment Practices Liability Insurance Policy |
|---|

Notice: This is a Claims Made Policy. This Policy covers only those **Claims** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if purchased. **Defense Costs** shall be applied against the Retention.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, the **Company** agrees as follows:

## I. INSURING AGREEMENT

**A.** The **Company** will pay on behalf of the **Insured, Loss** in excess of the Retention not exceeding the Limit of Liability shown on the policy Declarations for which this coverage applies that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or during any Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization.**

**B.** The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent.

## II. FULL PRIOR ACTS COVERAGE PROVISION

Coverage shall apply to any **Claim** made against an **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of cancellation or non-renewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable.

However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

**A.** the inception date of this Policy; or

**B.** the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

## III. DEFINITIONS

**A.** **"Application"** means:
   (1) an application and any material submitted for this Policy and
   (2) an application(s),and any material submitted, for all previous Policies issued by the **Company** providing continuous coverage until the inception date of this Policy.

The content of (1) and (2) above is incorporated by reference in this Policy as if physically attached hereto.

**B.** **"Claim"** means:
   **(1)** any written notice received by any **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Act**; or
   **(2)** any proceeding initiated against any **Insured**, including any appeal therefrom, seeking to hold such **Insured** responsible for a **Wrongful Act**, including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal, state or local agency and any appeal therefrom;

A **Claim** shall be considered first made when the **Insured** or its legal representative or agent first receives notice of a **Claim**.

**C.** **"Company"** means the insurer identified on the Policy Declarations.

**D.** **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend any **Insured**, resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** includes other fees, costs, costs of attachment or similar bonds (without any obligation on the part of the **Company** to apply for or furnish such bonds,) but does not include salaries, wages, overhead or benefits expenses of any **Insured**.

E. **"Discrimination"** means:
   (1) the termination of an employment relationship; or
   (2) a demotion or a failure to hire or promote any individual; or
   (3) any other limitation or classification of an **Employee** or applicant for employment which would deprive any individual of employment opportunities or adversely affect any individual's status as an **Employee**;

   because of race, color, religion, age, sex, disability, pregnancy, national origin, marital status, sexual orientation or other protected class or characteristic established under applicable federal, state, or local statute, ordinance, regulation or order.

F. "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

G. **"Employee"** means any natural person whose labor or service is engaged by and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.

An **Employee's** status as an **Insured** will be determined as of the date of the **Wrongful Act** that results in a **Claim**.

H. **"Harassment"** means:
   (1) sexual harassment including unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that is hostile, intimidating or offensive or that interferes with performance; or
   (2) other harassment which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

I. **"Individual Insured(s)"** means any persons who, now are, or shall be directors, officers, partners, managing members or **Employees** of the **Organization** including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

J. **"Insured(s)"** means the **Organization** and the **Individual Insureds**.

K. **"Loss"** means damages and settlements, front pay and back pay, and pre-judgment and post judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law but does not include fines, penalties, taxes, the multiplied portion of any multiple damage award or an express obligation to make payments in the event of the termination of employment.

   For the purpose of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

L. **"Organization"** means:
   (1) the **Parent Organization** and
   (2) any **Subsidiary** of the **Parent Organization;** and
   (3) any entity in its capacity as a debtor in possession of **(1)** or **(2)** above under the United States bankruptcy law or equivalent status under the law of any other jurisdiction.

M. **"Parent Organization"** means the entity named in Item 1 of the Policy Declarations.

N. **"Policy Period"** means the period from the effective date of this Policy as set forth in the Policy Declarations, to the expiration date or effective date of cancellation or non-renewal, if any.

O. **"Retaliation"** means any actual or alleged retaliatory treatment against an **Employee** because of:
   (1) the exercise of or attempt to exercise an **Employee's** rights under law; or
   (2) an **Employee's** disclosure or threat to disclose to a governmental agency or superior, acts of actual or alleged wrongdoing by an **Insured**; or
   (3) the filing of any claim under any federal, state, or local "whistle-blower" law including the Federal False Claims Act; or
   (4) **Employee** strikes or slowdowns.

P. "**Subsidiary**" means, for the purpose of this Policy, any entity which is more than 50% owned by the **Parent Organization** as of the effective date of this Policy and is disclosed

as a **Subsidiary** in an **Application** to the **Company.**

An entity formed or acquired after the effective date of this Policy is, for the purpose of this Policy, a **Subsidiary** if:
(1) the entity's **Employees** total less than 25% of the total work force of the **Parent Organization** and
(2) notice is given to the **Company** with full particulars about the new **Subsidiary** as soon as practicable but no later than the expiration date of this Policy or effective date of cancellation or non-renewal, if any

An entity which is formed or acquired after the effective date of this Policy and its **Employees** total 25% or more of the total work force of the **Parent Organization** is, for the purpose of this Policy, a **Subsidiary** if:
(1) notice is given to the **Company** of such **Subsidiary** as soon as practicable but within sixty (60) days of the formation or acquisition of the **Subsidiary** and
(2) the **Parent Organization** provides the **Company** with such information as the **Company** may deem necessary to determine insurability of the **Subsidiary** and
(3) the **Parent Organization** accepts any special terms, conditions, exclusions, limitations or premium imposed by the **Company** and
(4) the **Company**, at its sole discretion, agrees to insure the **Subsidiary.**

A **Subsidiary** which is sold or dissolved:
(1) after the effective date of this Policy and which was an **Insured** under this Policy; or
(2) prior to the effective date of this Policy and which was an **Insured** under a prior Policy issued by the **Company**;

shall continue to be an **Insured**, but only with respect to **Claims** first made during this **Policy Period** or Extended Reporting Period, if applicable, arising out of **Wrongful Acts** committed or allegedly committed during the time the entity was a **Subsidiary** of the **Parent Organization**.

Q. "**Workplace Tort**" means any actual or alleged employment-related:
(1) misrepresentation; or
(2) negligent supervision, training or evaluation; or
(3) wrongful discipline; or
(4) wrongful deprivation of a career opportunity; or

(5) failure to enforce written policies and procedures relating to a **Wrongful Act.**

R. "**Wrongful Act**" means any actual or alleged act of:
(1) **Discrimination;** or
(2) **Harassment;** or
(3) **Retaliation;** or
(4) **Wrongful Termination;** or
(5) **Workplace Tort;** or
(6) negligent violation of the Uniform Services Employment & Reemployment Rights Act; or
(7) negligent violation of the Family and Medical Leave Act of 1993; or
(8) negligent violation of state law having the same or substantially similar purpose as the Acts in **(6)** or **(7)** above; or
(9) acts described in clauses **(1)** through **(8)**above arising from the use of the **Organization's** Internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Organization's** Internet, e-mail, telecommunication or similar systems;

committed or allegedly committed by the **Organization** or by an **Individual Insured** acting solely within his/her capacity as such, involving and brought by any **Employee**, former **Employee** or applicant for employment with the **Organization** or asserted by any **Employee**, former **Employee** or applicant for employment with the **Organization** against an **Individual Insured** because of his/her status as such.

It is further agreed that the same **Wrongful Act**, an interrelated series of **Wrongful Acts** or a series of similar or related **Wrongful Acts** by one or more **Insureds** shall be deemed to be one **Wrongful Act** and to have commenced at the time of the earliest **Wrongful Act**.

S. "**Wrongful Termination**" means the actual or constructive termination of an employment relationship or the demotion of or the failure to promote any **Employee** in a manner which is illegal and wrongful or in breach of an implied agreement to continue employment**.**

## IV. EXCLUSIONS
A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for;

any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property

including any resulting loss of use; provided that this exclusion shall not apply to **Claims** for mental anguish, emotional distress, invasion of privacy, humiliation, libel, slander or defamation that result from a **Wrongful Act.**

**B.** The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** (except where otherwise noted) in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

**(1)** conduct of the **Insured** or at the **Insured's** direction that is fraudulent, dishonest or criminal provided that this exclusion will not apply to:

    **(a)** **Defense Costs** incurred until such conduct is established to be fraudulent, dishonest or criminal by final and non-appealable judgment or adjudication;

    **(b)** the strictly vicarious liability of the **Insured** for the fraudulent, dishonest or criminal conduct of another **Insured**; or

**(2)** any pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any amendments thereof or regulations promulgated thereunder or similar provisions of any federal, state or local statutory law or common law; provided that this exclusion will not apply to any **Claim** for actual or alleged **Retaliation** with regard to benefits paid or payable**;** or

**(3)** any obligation under a worker's compensation, disability benefits, insurance benefits or unemployment compensation law or any similar law or regulation; provided that this exclusion will not apply to any **Claim** for actual or alleged **Retaliation** with regard to benefits paid or payable; or

**(4)** any prior or pending litigation, administrative or regulatory proceeding, **Claim**, demand, arbitration, decree or judgment of which the **Insured** had written notice before the effective date of this Policy; or any fact, circumstance, event, situation, or **Wrongful Act** which before the effective date of this Policy

was the subject of any notice under any other similar policy of insurance to the **Insured**; or any future **Claims** or litigation based upon the pending or prior litigation or derived from the same or essentially the same facts, actual or alleged;

provided that, if this Policy is a renewal of a Policy or Policies previously issued by the **Company** and if the coverage provided by the **Company** was continuous from the effective date of the first such other Policy to the effective date of this Policy, the reference in this exclusion to the "effective" date" will mean the effective date of the first Policy under which the **Company** first provided continuous coverage to the **Insured**; or

**(5)** any lockout, strike, picket line, replacement of worker(s) or other similar actions resulting from labor disputes or labor negotiations; provided that this exclusion will not apply to a **Claim** for actual or alleged **Retaliation** arising from the foregoing; or

**(6)** the National Labor Relations Act, Labor Management Relations Act and amendments thereto, or any similar state, federal or local law or regulation; provided that this exclusion will not apply to a **Claim** for actual or alleged **Retaliation** arising from an **Insured's** alleged violation of such laws; or

**(7)** any **Claim** against any **Subsidiary** or its **Individual Insureds** for any **Wrongful Act** occurring prior to the date that such entity became a **Subsidiary** or any **Wrongful Act** occurring at any time that such entity is not a **Subsidiary**; or

**(8)** any damages which the **Insured** is legally obligated to pay by reason of the assumption of another's liability for a **Wrongful Act** in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement;

**(9)** actual or alleged violations of the Fair Labor Standards Act, any amendments thereto, or any similar provisions of any federal, state or local law(except the Equal Pay Act); or improper wages or wage disputes due to misclassification of **Employees** as exempt or non exempt; or misrepresentation involving any

USLIPOL000019

**Employee's** status as exempt or non-exempt.

C. The **Company** shall not be liable to make payment for **Loss** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

(1) the **Insured's** actual or alleged liability for damages under any express employment contract or express employment agreement; provided that this exclusion shall not apply to liability for a **Wrongful Act** which the **Insured** would have in the absence of such contract or agreement; or

(2) any costs or actual or alleged liability resulting from the modification of any real or personal property in order to make said real or personal property more accessible or accommodating to any disabled person.

**Defense Costs** shall be a part of and not in addition to the Limit of Liability stated in Item III of the Policy Declarations for C.(1) and C.(2) above.

## V. LIMITS OF LIABILITY AND RETENTION

Regardless of the number of **Insureds** under this Policy, **Claims** made or brought on account of **Wrongful Acts** or otherwise, the **Company's** liability is limited as follows:

A. The Limit of Liability specified in the Policy Declarations as "in the aggregate" shall be the maximum liability for **Loss** from all **Claims** to which this Policy applies.

B. The Limit of Liability specified in the Policy Declarations as the Limit for each **Claim** shall be the maximum liability for **Loss** for each **Claim** to which this Policy applies.

C. **Defense Costs** shall be in addition to the Limit of Liability shown in the Policy Declarations.

D. Subject to the Limits of Liability provisions stated in **A.**, **B.**, and **C.** above, the **Company** shall be liable to pay only **Defense Costs** and **Loss** in excess of the Retention specified in the Policy Declarations hereof as respects each and every **Claim** to which this Policy applies.

E. The **Company** shall have no obligation to pay any part or all of the Retention specified in the Policy Declarations for any **Claim** on

behalf of an **Insured**. If the **Company**, at its sole discretion, elects to pay any part or all of the Retention, the **Insureds** agree to repay such amounts to the **Company** upon demand.

F. The Limit of Liability for the Extended Reporting Period, if applicable, shall be a part of and not in addition to the Limit specified in the Policy Declarations.

G. **Claims** based upon or arising out of the same **Wrongful Act**, interrelated **Wrongful Acts**, or a series of similar or related **Wrongful Acts** shall be considered a single **Claim** and shall be considered first made during the **Policy Period** or Extended Reporting Period, if applicable, in which the earliest **Claim** arising out of such **Wrongful Act(s)** was first made and all **Loss** for such **Claims** shall be subject to the one Limit of Liability that applies to such earliest **Claim**.

H. The Limit of Liability for this Policy shall apply separately to each consecutive annual period starting with the beginning of the **Policy Period** shown in the Policy Declarations. If this Policy is issued for a period of more than twelve (12) months but less than twenty four (24) months or if the **Policy Period** is extended after issuance, the additional Extended Reporting Period will be deemed part of the last **Policy Period** for the purposes of determining the Limit of Liability.

## VI. SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of (a) such spousal or **Domestic Partner** status or (b) such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim**.

All definitions, exclusions, terms and conditions of this Policy, including the Retention, applicable to any **Claim** against, or **Loss** or **Defense Costs** sustained by, such **Individual Insured** shall also apply to this coverage extension.

The extension of coverage afforded by this Section VI shall not apply to the extent the **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement, neglect or breach of duty committed by such spouse or

USLIPOL000020

**Domestic Partner** as long as they are not also an **Individual Insured**.

## VII. EXTENDED REPORTING PERIOD

**A.** If the Policy expires, is cancelled or is non renewed for any reason other than non payment of premium, the **Parent Organization** shall have the right to purchase an Extended Reporting Period to report any **Claim**(s) or circumstance(s) which could be expected to give rise to a **Claim** being first made against an **Insured** during the twelve (12) months, twenty-four (24) months or thirty-six (36) months after the expiration date or effective date of such cancellation or non-renewal (depending upon the Extended Reporting Period purchased). An Extended Reporting Period shall only apply to a **Wrongful Act** committed before the date of the Policy expiration, cancellation or non-renewal. For the purpose of this clause, any change in premium terms or terms on renewal shall not constitute a refusal to renew.

**B.** The additional premium for the Extended Reporting Period shall be 50% of the annual premium set forth in the Policy Declarations for the twelve (12) month period; 100% of the annual premium set forth in the Policy Declarations for the twenty-four (24) month period; and 150% of the annual premium set forth in the Policy Declarations for the thirty-six (36) month period. The Extended Reporting Period begins on the expiration date or effective date of the cancellation or non-renewal of the Policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium set forth above no later than thirty (30) days after the expiration date or effective date of such cancellation or non-renewal.

**C.** All premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.

**D.** The Limits of Liability available during the Extended Reporting Period shall not exceed the balance of the Limits of Liability available on the expiration date or effective date of the cancellation or non-renewal of the Policy.

**E.** Coverage for **Claim(s)** or circumstances which ultimately lead to a **Claim(s)** first received and reported during the Extended Reporting Period shall be excess over any other valid and collectible insurance providing coverage for such **Claim(s)**.

## VIII. DEFENSE AND SETTLEMENT

**A.** The **Insured** shall not demand or agree to arbitration of any **Claim** without the written consent of the **Company**. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense without the **Company's** written consent.

**B.** Except as otherwise provided in this Policy, if a **Claim** is made against an **Insured** for **Loss** that is both covered and uncovered by this Policy, the **Company** will pay one hundred percent (100%) of the **Defense Costs** for the **Claim** until such time that the Limits of Liability of this policy are exhausted by payment of a covered **Loss** or the **Claim** for the covered **Loss** is resolved by settlement, verdict or summary judgment.

**C.** The **Company**, as it deems expedient, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or above the Retention.  If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company** is not obligated to pay any **Loss** or defend any **Claim** after the Limit of Liability has been exhausted by payment of **Loss** by settlement or otherwise. The **Company's** obligation to the **Insured** for **Defense Costs** and **Loss** attributable to such **Claim(s)** shall be limited to:

**(1)** the amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle;

**(2)** plus covered **Defense Costs** incurred up to the date the **Insured** first refused to settle;

**(3)** plus seventy five percent (75%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of **(1)**, **(2)** and **(3)** above is the limit of the **Company's** liability under this Policy for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to the Limits of Liability and Retention provisions of this Policy. The remaining twenty five percent (25%) of **Loss** and **Defense Costs** in excess of the amount referenced in (1) and (2) above shall be the obligation of the **Insured.**

**D.** The **Insured** agrees to cooperate with the **Company** on all **Claims**, and provide such

assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by a representative of the **Company**, under oath if required, and shall attend hearings, depositions and trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure for **Loss** or **Defense Costs**.

The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the execution of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name and shall provide all other assistance and cooperation which the **Company** may reasonably require.

## IX. NOTICE/CLAIM AND CIRCUMSTANCE REPORTING PROVISIONS

Notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against any **Insured** shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

**A.** As a condition precedent to exercising any right to coverage under this Policy, the **Insured** shall give to the **Company** written notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** as soon as practicable, but:

**(1)** if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal; or

**(2)** if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

**B.** If written notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** has

been given to the **Company** pursuant to Clause IX. **A.** above, then any **Claim** which is subsequently made against the **Insured** and reported to the **Company** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** for which notice was given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** for which notice was given, shall be considered made at the time such notice was given.

## X. CANCELLATION OR NON-RENEWAL

**A.** This Policy may be canceled by the **Parent Organization** by either surrender of the Policy thereof to the **Company** at its address stated on the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such cancellation shall be effective. If canceled by the **Parent Organization**, the **Company** shall retain the customary short rate proportion of the premium.

**B.** The **Company** may cancel this Policy only in the event of the failure of the **Insured** to pay the premium when due by mailing to the **Parent Organization** written notice when, not less than ten (10) days thereafter, such cancellation shall be effective.

**C.** In the event the **Company** refuses to renew this Policy, the **Company** shall mail to the **Parent Organization**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**.

**D.** The **Company** shall mail notice of Cancellation or Non-renewal by certificate of mailing stating the effective date of Cancellation or Non-renewal and the specific reason(s) for Cancellation or Non-renewal, which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of Cancellation or Non-renewal.

**E.** If the Policy is canceled by the **Company**, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected, or as soon as practicable thereafter.

USLIPOL000022

## XI. REPRESENTATIONS AND SEVERABILITY

**A.** The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of the Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and (3) the Policy is issued in reliance upon the truth of such representations.

**B.** An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available. However, facts pertaining to and knowledge possessed by the individual(s) signing the **Application** and the President, Chairperson, Chief Executive Officer, Partner and Chief Financial Officer shall be imputed to the **Organization** for the purpose of determining if coverage is available.

## XII. SUBROGATION

In the event of any payment under this Policy, the **Company** shall be subrogated to the **Insured's** right of recovery therefore against any person or entity and the **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall not do anything to prejudice such rights.

## XIII CHANGES

Notice to any agent or knowledge by any agent shall not effect a waiver or change in any part of this Policy or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed except by an endorsement, issued by the **Company** to form a part of this Policy.

## XIV. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of all **Insureds** with respect to the giving and receiving of any return premiums that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the

**Parent Organization** in writing, at the address of the **Parent Organization**. Such notice shall be deemed to be notice to all **Insureds**. The **Parent Organization** shall be the agent of all **Insureds** to effect changes in the Policy or purchase the Extended Reporting Period.

## XV. ASSIGNMENT

Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed hereon.

## XVI. OTHER INSURANCE

This Policy shall be excess of other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically written to be in excess of this Policy.

## XVII. TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

## XVIII. CHANGES IN EXPOSURE

**A.** If after the inception date of this Policy:

**(1)** the **Parent Organization** merges into or consolidates with another entity such that the **Parent Organization** is not the surviving entity; or
**(2)** another entity, person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Parent Organization**; or
**(3)** another entity, person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the directors of the **Parent Organization**; or
**(4)** the **Parent Organization** sells all or substantially all of its assets ,

the above events referred to as a "Transaction";

this Policy shall continue in full force and effect until the expiration date shown in the Policy Declarations or the effective date of non-renewal if applicable, with respect to **Wrongful Acts** occurring before the Transaction, but there shall be no coverage under this Policy for actual or alleged **Wrongful Acts** occurring on and after the Transaction. The entire premium for this Policy shall be deemed fully earned on the transaction date. In the event of a Transaction, the **Parent Organization** shall have the right to an offer of coverage by the **Company** for an Extended Reporting Period to report **Wrongful**

USLIPOL000023

**Acts** occurring prior to the effective date of the Transaction.

**B.** The **Parent Organization** shall give the **Company** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

## XIX. ACTION AGAINST THE COMPANY

**A.** No action shall lie against the **Company** unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant or the claimant's legal representative, and the **Company**.

**B.** Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or entity shall have any right under this Policy to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or their legal representatives.

Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Company** of its obligations hereunder.

## XX. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

USLIPOL000024

# INSURANCE

# POLICY

## UNITED STATES LIABILITY INSURANCE GROUP

A STOCK COMPANY

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

USLIPOL000025

# INSURANCE POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.

Secretary

President

**EXHIBIT "B"**

Wyatt M. Bailey (Bar No. 20356)
MEAGHER & GEER, PLLP
16767 N. Perimeter Dr., Suite 210
Scottsdale, Arizona 85260
Telephone:  480-607-9719
Facsimile:   480-607-9780
wbailey@meagher.com
*Attorneys for Defendant United States*
*Liability Insurance Company*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Green Fili, LLC, an Arizona limited liability company,<br><br>                           Plaintiffs,<br><br>       vs.<br><br>United States Liability Insurance Company, a Nebraska company; ABC Corporations I-X; XYZ Partnerships I-X; John Does I-X; and Jane Does I-X,<br><br>                           Defendants. | Case No. 2:23-cv-00655-DGC<br><br>**DECLARATION OF KEVIN BROWN IN SUPPORT OF UNITED STATES LIABILITY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Maricopa County Superior Court Case No. CV2023-004283 |

I, Kevin Brown, declare and state as follows:

1.      I am a Coverage Specialist in the Claims Department at United States Liability Insurance Company ("USLI") and in that capacity I handle matters for USLI, the Defendant in the above-captioned matter.  I make this declaration in support of USLI's motion for summary judgment.  I have personal knowledge of the facts stated in this declaration and can competently testify to these facts if called as a witness in these proceedings.

2.      I was assigned to the claim related to *Guadarrama, et al. v. Green Fili, LLC,*

1

*et al.*, Maricopa County Superior Court Arizona, case number CV2021-013286 (the "Underlying Case").  In the course of evaluating this claim, I have personally reviewed the Employment Practices Liability Policy that USLI issued to named insured USA Truck Center, LLC, under which Green Fili qualified as an insured.

3.      Attached as Exhibit A to USLI's motion is a true and correct copy of policy number EPL1559591E issued by USLI to USA Truck Center, LLC, and in effect for the Policy Period 01/08/2021-01/08/2022.

4.      Attached as Exhibit C to USLI's motion is a true and correct copy of policy number EPL1559591F issued by USLI to USA Truck Center, LLC, and in effect for the Policy Period 01/08/2022-01/08/2023.

5.      No Insured under the 2021-2022 Policy requested or purchased an Extended Reporting Period from USLI.

6.      By letter, dated April 11, 2022, ULSI denied Green Fili coverage for the allegations in the Underlying Case citing, in part, the fact that Green Fili did not report the claim within sixty days after the expiration of the 21-22 Policy. Attached as Exhibit H to USLI's motion is true and correct copy of the April 11, 2022 letter.

7.      By letter, dated April 11, 2022, ULSI denied Green Fili coverage for the allegations in the Underlying Case citing, in part, the fact that the Claims against Green Fili were not first made during the 22-23 Policy. Attached as Exhibit H to USLI's motion is true and correct copy of the April 11, 2022 letter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 30  , 2023 at Oakbrook, IL  .

_____
Kevin Brown
Coverage Specialist
United States Liability Insurance Company

# EXHIBIT "C"

| EPL1559591E | | Home Office Copy |
|---|---|---|

EPL1559591E
Renewal of Number

**POLICY DECLARATIONS**

**United States Liability Insurance Company**
**1190 Devon Park Drive, Wayne, Pennsylvania 19087**
A Member Company of United States Liability Insurance Group

**Home Office Copy**
**Direct Bill Policy**

**No. EPL1559591F**

NAMED INSURED AND ADDRESS:

**USA TRUCK CENTER, LLC**
**C/O RAJ PATEL**
**9831 S 51ST ST SUITE D134**
**PHOENIX, AZ 85044**

POLICY PERIOD: (MO. DAY YR.)  From:  01/08/2022  To:  01/08/2023

12:01 A.M. STANDARD TIME AT YOUR
MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.

PREMIUM

Employment Practices Liability Insurance

**TOTAL:**

Coverage Form(s) and Endorsement(s) made a part of this policy at time of issue

**See Endorsement EOD (1/95)**

Agent:  **LEAVITT GROUP AGENCY ASSOCIATION (2476)**
**PO Box 160**
**Cedar City, UT  84720**

Issued:  **01/04/2022 11:22 AM**

Broker:  Farmer Woods Group
919 North 1st STreet
Phoenix, AZ  85004

By:  _Thomas P. Nerney_
Authorized Representative

UPD (08-07)

**THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE PART COVERAGE FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.**

USLIPOL000027

# EXTENSION OF DECLARATIONS

**Policy No. EPL1559591F**

Effective Date:   **01/08/2022**

12:01 AM STANDARD TIME AT YOUR MAILING ADDRESS

## FORMS AND ENDORSEMENTS

**The following forms apply to the policy**

| Endt# | Revised | Description of Endorsements |
|---|---|---|
| EPL-108 | 09/07 | Expanded Definition Of Organization Endorsement |
| EPL-122 | 06/09 | Franchisor Exclusion |
| EPL-144 | 09/07 | Third Party Coverage Endorsement |
| EPL-148 | 09/07 | Retroactive Date Endorsement |
| EPL-162 | 05/10 | Fair Labor Standards Act Sub-Limit Endorsement |
| EPL-167 | 05/09 | Amended Definition Of Loss Endorsement |
| EPL-169 | 11/13 | Amended Notice/Claim And Circumstance Reporting Provisions |
| EPL-AZ | 09/07 | Arizona State Amendatory Endorsement |
| EPL-J | 09/07 | Employment Practices Liability Insurance Policy |
| JACKET AZ | 07-19 | Policy Jacket |

USLIPOL000028

### EMPLOYMENT PRACTICES LIABILITY COVERAGE PART DECLARATIONS

**PLEASE READ YOUR POLICY CAREFULLY.**

**THIS IS A CLAIMS MADE POLICY COVERAGE FORM AND UNLESS OTHERWISE PROVIDED HEREIN, THE COVERAGE OF THIS FORM IS LIMITED TO LIABILITY FOR CLAIMS FIRST MADE DURING THE POLICY PERIOD, OR THE EXTENSION PERIOD, IF APPLICABLE.  DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**NOTICE: DEFENSE COSTS SHALL BE APPLIED AGAINST THE RETENTION.**

**No.  EPL1559591F**

Effective Date: **01/08/2022**

12:01 AM STANDARD TIME

ITEM I. PARENT ORGANIZATION AND PRINCIPAL ADDRESS

**USA TRUCK CENTER, LLC**
**C/O RAJ PATEL**
**9831 S 51ST ST SUITE D134**
**PHOENIX, AZ 85044**

ITEM II. POLICY PERIOD: (MM/DD/YYYY)  From:  01/08/2022  To:  01/08/2023

## Employment Practices Liability

| ITEM III. LIMITS OF LIABILITY | **$500,000** | EACH CLAIM |
|---|---|---|
| | **$500,000** | IN THE AGGREGATE |
| ITEM IV. RETENTION: | **$2,500** | EACH CLAIM |
| ITEM V. PREMIUM: | **$10,326** | |
| ITEM VI. RETROACTIVE DATE: | **01/08/2016** | |
| ITEM VII. CO-INSURANCE: | **0.00%** | |

ITEM VIII. Coverage Form(s)/Part(s) and Endorsement(s) made a part of this policy at time of issue:
**See Endorsement EOD (01/95)**

**THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.**

USLIPOL000029

**This page has been intentionally left blank.**

USLIPOL000030

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## EXPANDED DEFINITION OF ORGANIZATION ENDORSEMENT

It is hereby agreed that Section III. DEFINITIONS, L. "**Organization**" is amended to include the following:

Green Fili, LLC

Jay Sibal Shushi Investments, LLC

Best Sub, LLC

Lake Havasu City LHC, LLC

Invest Group, LLC

All other terms and conditions of this policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy, unless another effective date is shown.

**UNITED STATES LIABILITY INSURANCE GROUP**
**WAYNE, PENNSYLVANIA**

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## FRANCHISOR EXCLUSION

It is hereby agreed that the **Company** shall not be liable to make any payment for **Loss** or **Defense Costs** based upon, arising out of, directly or indirectly resulting from or in consequence of any **Claim**:

1. Brought against any **Insured** by any current or former **Franchisor** or any other current or former franchisee of a **Franchisor**;

2. Brought against any **Insured** based solely on the acts or omissions of a current or former **Franchisor** or any other current or former franchisee(s) of a **Franchisor**; or

3. Brought against any **Insured** as a class action lawsuit, whether certified or not, based in whole or in part on**:**

   a. the **Insured's** franchise relationship with any current or former F**ranchisor**;

   b. the acts or omissions of a current or former **Franchisor**; or

   c. the acts or omissions of any other current or former franchisee(s) of a **Franchisor**.

For the purpose of this endorsement:

"**Franchisor**" means a person or entity with whom or for whom any **Insured** operates a franchise under any form of franchise agreement.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## THIRD PARTY COVERAGE ENDORSEMENT

Section III. DEFINITIONS, R. "**Wrongful Act**", is amended to add the following paragraph:

**Wrongful Act** shall also include any actual or alleged act of:

(1) **Third Party Discrimination;** or
(2) **Third Party Harassment.**

Section III. DEFINITIONS, is amended to add the following**:**

T.  "**Third Party**" means any person(s) with whom an **Insured** in their capacity as such interacts while the **Insured** is performing duties related to the conduct of the **Organization's** business.

U.  "**Third Party Discrimination**" means discrimination by an **Insured**, in their capacity as such, against a **Third Party** based upon such **Third Party**'s race, religion, age, sex, disability, national origin, sexual orientation or other protected class or characteristic established under applicable federal, state or local statute or ordinance while the **Insured** is performing duties related to the conduct of the **Organization's** business.

V.  "**Third Party Harassment**" means; sexual harassment including any unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature against a **Third Party,** or other harassment which creates an environment that is hostile, intimidating or offensive to a **Third Party;**

committed or allegedly committed by an **Insured** in their capacity as such while the **Insured** is performing duties related to the conduct of the **Organization's** business.  **Third Party Harassment** shall not include sexual abuse or molestation.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

USLIPOL000033

**UNITED STATES LIABILITY INSURANCE GROUP**
**WAYNE, PENNSYLVANIA**

---

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

---

## RETROACTIVE DATE ENDORSEMENT

It is hereby agreed that section II. FULL PRIOR ACTS COVERAGE PROVISION is deleted and replaced with the following:

Coverage shall apply to any **Claim** made against the **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of the cancellation or nonrenewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable.

However, coverage shall not apply to any **Claim** made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a **Wrongful Act** committed or alleged to have been committed prior to 01/08/2016.

Coverage shall also not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge, or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

A.   the inception date of this Policy; or

B.   the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## FAIR LABOR STANDARDS ACT SUB-LIMIT ENDORSEMENT

It is agreed that

I. INSURING AGREEMENT is amended by addition of the following:
 **C.** The **Company** will pay on behalf of the **Insured** a sub-limit of liability of $100,000 in excess of the Retention for all **Loss** and **Defense Costs** combined that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if applicable, for any actual or alleged violation of the federal Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act including misclassification of or misrepresentation to **Employees** under these laws.  This sub-limit does not apply to or restrict the Limit of Liability described in **A.** above, for **Claims** alleging violations of the Equal Pay Act.

III. DEFINITIONS, R. "**Wrongful Act**", is amended to add the following
 **(10)** violation of the federal Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act;

IV. EXCLUSIONS, **B.(9)**, is deleted in its entirety for purposes of coverage provided by this endorsement only.

V. LIMITS OF LIABILITY AND RETENTION is amended by addition of the following:
 The $100,000 Sub-Limit of Liability for an actual or alleged violation of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act shall be a part of and not in addition to the Limit specified in the Policy Declarations.  **Defense Costs** for **Claims** arising out of an actual or alleged violation of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act shall be included within the $100,000 Sub-Limit of Liability set forth in this endorsement.  The $100,000 Sub-Limit of Liability shall be the maximum liability for **Loss** and **Defense Costs** from all **Claims** for actual or alleged violations of the Fair Labor Standards Act, amendments thereto or provisions of any similar federal, state or

USLIPOL000035

local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act.

VIII. DEFENSE AND SETTLEMENT, **B.**, is amended by addition of the following:

However, in the case of a **Claim** involving an actual or alleged violation of the Fair Labor Standards Act, any amendments thereto, or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act, the **Company** will pay **Defense Costs** until such time as the $100,000 Sub-Limit of Liability provided by INSURING AGREEMENT, **C.**, is exhausted by payment of **Loss** and/or **Defense Costs** applicable to actual or alleged violations of the Fair Labor Standards Act, any amendments thereto or the provisions of any similar federal, state or local law regulating minimum wage, working hours, overtime, child labor, record keeping and other matters regulated under the federal Fair Labor Standards Act  at which point the **Company** shall have no further duty to defend such **Claim**.

All other terms and conditions of this Policy remain unchanged.  This endorsement is a part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown.

EPL 162 (05-10)                                                                                      Page 2 of 2

USLIPOL000036

# UNITED STATES LIABILITY INSURANCE GROUP
# WAYNE, PENNSYLVANIA

This Endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## AMENDED DEFINITION OF LOSS ENDORSEMENT

It is hereby agreed that Section III. DEFINITIONS is amended by deleting paragraph **K**. and replacing it with the following:

**K.** "**Loss**" means damages, settlements, front pay, back pay, and pre-judgment and post-judgment interest awarded by a court.

**Loss** also includes:

**(1)** punitive and exemplary damages;

**(2)** liquidated damages awarded by a court pursuant to a violation of the Equal Pay Act, the Age Discrimination in Employment Act, the Family Medical Leave Act, and the Fair Labor Standards Act (if endorsement EPL-162 is endorsed to this policy), all as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local law, statute or regulation; and

**(3)** the multiplied portion of any multiplied damage award

to the extent such damages are insurable under applicable law, statute or regulation. For the purpose of determining the insurability of punitive, exemplary or liquidated damages or the multiplied portion of any multiplied damage award, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

**Loss** does not include:

**(1)** fines, penalties and taxes;

**(2)** monetary sanctions that are uninsurable by operation of law;

**(3)** an express obligation to make payment in the event of the termination of employment.

All other terms and conditions of this Policy remain unchanged. This endorsement is a part of your Policy and takes effect on the effective date of your Policy unless another effective date is shown.

> This endorsement modifies insurance provided under the following:
>
> **EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## Amended Notice/Claim And Circumstance Reporting Provisions

It is agreed:

I. INSURING AGREEMENT is deleted in its entirety and replaced by:
   **A.** The **Company** will pay on behalf of the **Insured**, **Loss** in excess of the Retention not exceeding the Limit of Liability shown on the policy Declarations for which this coverage applies that the **Insured** shall become legally obligated to pay because of Claims first made against the **Insured** during the **Policy Period** or during any Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization**. Such **Claim** must be reported to the Company in accordance with Section IX herein.

   **B.** The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent.

II. FULL PRIOR ACTS COVERAGE PROVISION is deleted in its entirely and replaced by:
   Coverage shall apply to any **Claim** made against an **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of cancellation or non-renewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable. Such **Claim** must be reported to the Company in accordance with Section IX herein.

   However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:
   **A.** the inception date of this Policy; or

   **B**. the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

VII. EXTENDED REPORTING PERIOD is deleted in its entirety and replaced by:
   **A.** If the policy expires, is cancelled or non-renewed for any reason other than non-payment of premium, the **Parent Organization** shall have the right to purchase an Extended Reporting Period to report to the **Company** as soon as practicable during the Extended Reporting Period any **Claim (s)** being first made against an **Insured** during the twelve (12) months, or twenty-four (24) months or  thirty six (36) months after the effective date of such

USLIPOL000038

expiration, non-renewal or cancellation (depending upon the Extended Reporting Period purchased,). For the purpose of this section, any change in premium terms or terms on renewal shall not constitute a refusal to renew.  An Extended Reporting Period shall only apply to a **Claim** arising from a **Wrongful Act** which was committed before the date of such expiration, cancellation or non-renewal.

**B.** The additional premium for the Extended Reporting Period shall be 50% of the annual premium set forth in the Policy Declarations for the twelve (12) month period; 100% of the annual premium set forth in the Policy Declarations for the twenty-four (24) month period; or 150% of the annual premium set forth in the Policy Declarations for the thirty-six (36) month period. The Extended Reporting Period begins on the expiration date or the effective date of cancellation or non-renewal of the policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium due above no later than thirty (30) days after the effective date of such expiration, cancellation or non-renewal.

**C.** All premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.

**D.** The Limits of Liability available during the Extended Reporting Period shall not exceed the balance of the Limits of Liability available on the expiration date or effective date of cancellation or non-renewal of the policy.

**E.** Coverage for a **Claim** first received and reported during the Extended Reporting Period shall be excess over any other valid and collectible insurance providing coverage for such **Claim.**

IX. NOTICE/CLAIM AND CIRCUMSTANCE REPORTING PROVISIONS is deleted in its entirety and replaced by:

Notice hereunder shall be given in writing to the **Company**.  If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

**A.  Written Notice of a Claim:**

**(1)** As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim,** as soon as practicable but:

**(a)** if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an **Insured** prior to the Policy expiration or effective date of cancellation or non-renewal; or

**(b)** if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period;

USLIPOL000039

provided that if the **Company** sends written notice to the **Parent Organization** stating that this Policy is being terminated for nonpayment of premium, an **Insured** shall give to the **Company** written notice of such **Claim** prior to the effective date of such termination.

(2) If an Extended Reporting Period is purchased, notice of **Claim** shall be in accordance with the terms and conditions of Section VII. EXTENDED REPORTING PERIOD.

**B. Written Notice of a Circumstance:**

(1) An **Insured** shall give to the **Company** written notice of a circumstance which could reasonably be expected to give rise to a **Claim** being made against an **Insured** as soon as practicable during the **Policy Period** in which an **Insured** first becomes aware of the circumstance.

(2) If written notice of a circumstance which could reasonably be expected to give rise to a **Claim** being made against an **Insured** has been given to the **Company** during the **Policy Period**, any **Claim** which is subsequently made against an **Insured** and reported to the **Company** alleging, arising out of, based upon, or attributable to the facts set forth in the reported circumstance shall be considered to have been first made at the time such notice of the circumstance was given.  Coverage for a circumstance reported pursuant to this provision applies only if the **Wrongful Act** that is the subject of the reported circumstance occurs prior to the expiration date or if applicable, prior to the effective date of cancellation or non-renewal of the **Policy Period** in which the circumstance was reported.

(3) When reporting a circumstance to the **Company**, an **Insured** shall give the reasons for anticipating why the circumstance could reasonably be expected to give rise to a **Claim** being made against an **Insured** with full particulars as to the dates and persons involved.

All other terms and conditions of this Policy remain unchanged.  This endorsement is part of the **Parent Organization's** Policy and takes effect on the effective date of the **Parent Organization's** Policy unless another effective date is shown**.**

USLIPOL000040

## UNITED STATES LIABILITY INSURANCE GROUP
## WAYNE, PENNSYLVANIA

This endorsement modifies insurance provided under the following:

**EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY**

## ARIZONA STATE AMENDATORY ENDORSEMENT

To be attached to and form a part of all Employment Practices Liability policies written in the state of Arizona.

It is hereby agreed that Section III. DEFINITIONS, is amended to include the following:

T.  "**Retroactive Date**" is the date stated in Item VI. of the Policy Declarations for which any **Wrongful Act** occurring prior to that date is excluded from coverage for **Loss** and **Defense Costs** even if the **Claim** is first made during the **Policy Period**.

It is further agreed that Section X. CANCELLATION OR NON-RENEWAL, is amended to add the following:

F.  If one of the following occur, the **Company** is not required to provide written notice of non-renewal:

(1) The **Company** or a **Company** within the same insurance group has offered to issue a renewal policy; or

(2) The **Insured** obtained replacement coverage or agreed in writing to replace coverage

G.  If the **Company** elects to renew this Policy and the renewal is subject to any of the following:

(1) Increase in premium;

(2) Change in deductible;

(3) Reduction in Limits of Liability; or

(4) Substantial reduction in coverage;

the **Company** is required to provide written notice to the **Parent Organization**.  If the **Company** fails to provide written notice sixty (60) days prior to the anniversary or expiration date of this Policy, the following procedures apply:

(1) The current Policy will remain in effect until the earlier of the following:

a.  Sixty (60) days after the date of mailing or delivery of the notice; or

b.  The effective date of replacement coverage obtained by the **Parent Organization**

(2) If the **Parent Organization** accepts the renewal, the premium increase, if any, and other changes are effective the day following this Policy anniversary or expiration date.

All other terms and conditions of this policy remain unchanged.  This endorsement is a part of your policy and takes effect on the effective date of your policy unless another effective date is shown.

USLIPOL000041

| Employment Practices Liability Insurance Policy |
| --- |

Notice: This is a Claims Made Policy.  This Policy covers only those **Claims**  first made against the **Insured** during the **Policy Period** or Extended Reporting Period, if purchased.  **Defense Costs** shall be applied against the Retention.

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the **Company**, including the statements made in the **Application** and all attachments and materials submitted therewith, and subject to all the provisions of this Policy, the **Company** agrees as follows:

## I.   INSURING AGREEMENT

**A.**   The **Company** will pay on behalf of the **Insured, Loss** in excess of the Retention not exceeding the Limit of Liability shown on the policy Declarations for which this coverage applies that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the **Policy Period** or during any Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on behalf of the **Organization.**

**B.**   The **Company** has the right and duty to defend any **Claim** to which this insurance applies, even if the allegations of the **Claim** are groundless, false or fraudulent.

## II.  FULL PRIOR ACTS COVERAGE PROVISION

Coverage shall apply to any **Claim** made against an **Insured** for **Wrongful Acts** arising solely out of the **Insured's** duties on behalf of the **Organization** committed prior to the expiration date of this Policy or the effective date of cancellation or non-renewal of this Policy, if applicable, provided that the **Claim** is first made during the **Policy Period**, or Extended Reporting Period, if applicable.

However, coverage shall not apply to any **Claim** based upon or arising out of any **Wrongful Act** or circumstance likely to give rise to a **Claim** of which the person or persons signing the **Application** had knowledge or otherwise had a reasonable basis to anticipate might result in a **Claim**, prior to the earlier of:

**A.**   the inception date of this Policy; or

**B.**   the inception date of the first Policy of this type the **Company** has issued to the **Parent Organization**, provided that the **Company** has written continuous coverage for the **Parent Organization** from such date to the inception date of this Policy.

## III.  DEFINITIONS

**A.**   **"Application"** means:

(1)   an application and any material submitted for this Policy and

(2)   an application(s),and any material submitted, for all previous Policies issued by the **Company** providing continuous coverage until the inception date of this Policy.

The content of (1) and (2) above is incorporated by reference in this Policy as if physically attached hereto.

**B.**   **"Claim"** means:

**(1)**   any written notice received by any **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Act**; or

**(2)**   any proceeding initiated against any **Insured**, including any appeal therefrom, seeking to hold such **Insured** responsible for a **Wrongful Act**, including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal, state or local agency and any appeal therefrom;

A **Claim** shall be considered first made when the **Insured** or its legal representative or agent first receives notice of a **Claim**.

**C.**   **"Company"** means the insurer identified on the Policy Declarations.

**D.**   **"Defense Costs"** means reasonable and necessary legal fees and expenses incurred by the **Company**, or by any attorney designated by the **Company** to defend any **Insured**, resulting from the investigation, adjustment, defense and appeal of a **Claim**. **Defense Costs** includes other fees, costs, costs of attachment or similar bonds (without any obligation on the part of the **Company** to apply for or furnish such bonds,) but does not include salaries, wages, overhead or benefits expenses of any **Insured**.

E. **"Discrimination"** means:
   (1) the termination of an employment relationship; or
   (2) a demotion or a failure to hire or promote any individual; or
   (3) any other limitation or classification of an **Employee** or applicant for employment which would deprive any individual of employment opportunities or adversely affect any individual's status as an **Employee**;

   because of race, color, religion, age, sex, disability, pregnancy, national origin, marital status,  sexual orientation or other protected class or characteristic established under applicable federal, state, or local statute, ordinance, regulation or order.

F. "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

G. **"Employee"** means any natural person whose labor or service is engaged by and directed by the **Organization** while performing duties related to the conduct of the **Organization's** business and includes leased, part-time, seasonal and temporary workers, independent contractors, volunteers and interns.

An **Employee's** status as an **Insured** will be determined as of the date of the **Wrongful Act** that results in a **Claim**.

H. **"Harassment"** means:
   (1) sexual harassment including unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that is hostile, intimidating or offensive or that interferes with performance; or
   (2) other harassment which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

I. **"Individual Insured(s)"** means any persons who now are, or shall be directors, officers, partners, managing members or **Employees** of the **Organization** including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

J. **"Insured(s)"** means the **Organization** and the **Individual Insureds**.

K. **"Loss"** means damages and settlements, front pay and back pay, and pre-judgment and post judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law but does not include fines, penalties, taxes, the multiplied portion of any multiple damage award or an express obligation to make payments in the event of the termination of employment.

   For the purpose of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of such damages shall control, provided that such jurisdiction has a substantial relationship to the relevant **Insured** or to the **Claim** giving rise to the damages.

L. **"Organization"** means:
   (1) the **Parent Organization** and
   (2) any **Subsidiary** of the **Parent Organization;** and
   (3) any entity in its capacity as a debtor in possession of **(1)** or **(2)** above under the United States bankruptcy law or equivalent status under the law of any other jurisdiction.

M. **"Parent Organization"** means the entity named in Item 1 of the Policy Declarations.

N. **"Policy Period"** means the period from the effective date of this Policy as set forth in the Policy Declarations, to the expiration date or effective date of cancellation or non-renewal, if any.

O. **"Retaliation"** means any actual or alleged retaliatory treatment against an **Employee** because of:
   (1) the exercise of or attempt to exercise an **Employee's** rights under law; or
   (2) an **Employee's** disclosure of or threat to disclose to a governmental agency or superior, acts of actual or alleged wrongdoing by an **Insured**; or
   (3) the filing of any claim under any federal, state, or local "whistle-blower" law including the Federal False Claims Act; or
   (4) **Employee** strikes or slowdowns.

P. "**Subsidiary**" means, for the purpose of this Policy, any entity which is more than 50% owned by the **Parent Organization** as of the effective date of this Policy and is disclosed

as a **Subsidiary** in an **Application** to the **Company.**

An entity formed or acquired after the effective date of this Policy is, for the purpose of this Policy, a **Subsidiary** if:
(1) the entity's **Employees** total less than 25% of the total work force of the **Parent Organization** and
(2) notice is given to the **Company** with full particulars about the new **Subsidiary** as soon as practicable but no later than the expiration date of this Policy or effective date of cancellation or non-renewal, if any

An entity which is formed or acquired after the effective date of this Policy and its **Employees** total 25% or more of the total work force of the **Parent Organization** is, for the purpose of this Policy, a **Subsidiary** if:
(1) notice is given to the **Company** of such **Subsidiary** as soon as practicable but within sixty (60) days of the formation or acquisition of the **Subsidiary** and
(2) the **Parent Organization** provides the **Company** with such information as the **Company** may deem necessary to determine insurability of the **Subsidiary** and
(3) the **Parent Organization** accepts any special terms, conditions, exclusions, limitations or premium imposed by the **Company** and
(4) the **Company**, at its sole discretion, agrees to insure the **Subsidiary.**

A **Subsidiary** which is sold or dissolved:
(1) after the effective date of this Policy and which was an **Insured** under this Policy; or
(2) prior to the effective date of this Policy and which was an **Insured** under a prior Policy issued by the **Company**;

shall continue to be an **Insured**, but only with respect to **Claims** first made during this **Policy Period** or Extended Reporting Period, if applicable, arising out of **Wrongful Acts** committed or allegedly committed during the time the entity was a **Subsidiary** of the **Parent Organization**.

Q. "**Workplace Tort**" means any actual or alleged employment-related:
(1) misrepresentation; or
(2) negligent supervision, training or evaluation; or
(3) wrongful discipline; or
(4) wrongful deprivation of a career opportunity; or

(5) failure to enforce written policies and procedures relating to a **Wrongful Act.**

R. "**Wrongful Act**" means any actual or alleged act of:
(1) **Discrimination;** or
(2) **Harassment;** or
(3) **Retaliation;** or
(4) **Wrongful Termination;** or
(5) **Workplace Tort;** or
(6) negligent violation of the Uniform Services Employment & Reemployment Rights Act; or
(7) negligent violation of the Family and Medical Leave Act of 1993; or
(8) negligent violation of state law having the same or substantially similar purpose as the Acts in **(6)** or **(7)** above; or
(9) acts described in clauses **(1)** through **(8)** above arising from the use of the **Organization's** Internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Organization's** Internet, e-mail, telecommunication or similar systems;

committed or allegedly committed by the **Organization** or by an **Individual Insured** acting solely within his/her capacity as such, involving and brought by any **Employee**, former **Employee** or applicant for employment with the **Organization** or asserted by any **Employee**, former **Employee** or applicant for employment with the **Organization** against an **Individual Insured** because of his/her status as such.

It is further agreed that the same **Wrongful Act**, an interrelated series of **Wrongful Acts** or a series of similar or related **Wrongful Acts** by one or more **Insureds** shall be deemed to be one **Wrongful Act** and to have commenced at the time of the earliest **Wrongful Act**.

S. "**Wrongful Termination**" means the actual or constructive termination of an employment relationship or the demotion of or the failure to promote any **Employee** in a manner which is illegal and wrongful or in breach of an implied agreement to continue employment.

## IV. EXCLUSIONS

A. The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** in connection with any **Claim** made against the **Insured** for;

any actual or alleged bodily injury, sickness, disease or death of any person, or damage to or destruction of any tangible property

including any resulting loss of use; provided that this exclusion shall not apply to **Claims** for mental anguish, emotional distress, invasion of privacy, humiliation, libel, slander or defamation that result from a **Wrongful Act.**

B.  The **Company** shall not be liable to make payment for **Loss** or **Defense Costs** (except where otherwise noted) in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

(1)  conduct of the **Insured** or at the **Insured's** direction that is fraudulent, dishonest or criminal provided that this exclusion will not apply to:
   (a)  **Defense Costs** incurred until  such conduct is established to be fraudulent, dishonest or criminal by final and non-appealable judgment or adjudication; or
   (b)  the strictly vicarious liability of the **Insured** for the fraudulent, dishonest or criminal conduct of another **Insured**; or

(2)  any pension, profit sharing, welfare benefit or other employee benefit program established in whole or in part for the benefit of any **Individual Insured**, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any amendments thereof or regulations promulgated thereunder or similar provisions of any federal, state or local statutory law or common law; provided that this exclusion will not apply to any **Claim** for actual or alleged **Retaliation** with regard to benefits paid or payable**;** or

(3)  any obligation under a worker's compensation, disability benefits, insurance benefits or unemployment compensation law or any similar law or regulation; provided that this exclusion will not apply to any **Claim** for actual or alleged **Retaliation** with regard to benefits paid or payable; or

(4)  any prior or pending litigation, administrative or regulatory proceeding, **Claim**, demand, arbitration, decree or judgment of which the **Insured** had written notice before the effective date of this Policy; or any fact, circumstance, event, situation, or **Wrongful Act** which before the effective date of this Policy

was the subject of any notice under any other similar policy of insurance to the **Insured**; or any future **Claims** or litigation based upon the pending or prior litigation or derived from the same or essentially the same facts, actual or alleged;

provided that, if this Policy is a renewal of a Policy or Policies previously issued by the **Company** and if the coverage provided by the **Company** was continuous from the effective date of the first such other Policy to the effective date of this Policy, the reference in this exclusion to the "effective" date will mean the effective date of the first Policy under which the **Company** first provided continuous coverage to the **Insured**; or

(5)  any lockout, strike, picket line, replacement of worker(s) or other similar actions resulting from labor disputes or labor negotiations; provided that this exclusion will not apply to a **Claim** for actual or alleged **Retaliation** arising from the foregoing; or

(6)  the National Labor Relations Act, Labor Management Relations Act and amendments thereto, or any similar state, federal or local law or regulation; provided that this exclusion will not apply to a **Claim** for actual or alleged **Retaliation** arising from an **Insured's** alleged violation of such laws; or

(7)  any **Claim** against any **Subsidiary** or its **Individual Insureds** for any **Wrongful Act** occurring prior to the date that such entity became a **Subsidiary** or any **Wrongful Act** occurring at any time that such entity is not a **Subsidiary**; or

(8)  any damages which the **Insured** is legally obligated to pay by reason of the assumption of another's liability for a **Wrongful Act** in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement;

(9)  actual or alleged violations of the Fair Labor Standards Act, any amendments thereto, or any similar provisions of any federal, state or local law(except the Equal Pay Act); or improper wages or wage disputes due to misclassification of **Employees** as exempt or non exempt; or misrepresentation involving any

USLIPOL000045

**Employee's** status as exempt or non-exempt.

C. The **Company** shall not be liable to make payment for **Loss** in connection with any **Claim** made against the **Insured** arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

(1) the **Insured's** actual or alleged liability for damages under any express employment contract or express employment agreement; provided that this exclusion shall not apply to liability for a **Wrongful Act** which the **Insured** would have in the absence of such contract or agreement; or

(2) any costs or actual or alleged liability resulting from the modification of any real or personal property in order to make said real or personal property more accessible or accommodating to any disabled person.

**Defense Costs** shall be a part of and not in addition to the Limit of Liability stated in Item III of the Policy Declarations for C.(1) and C.(2) above.

## V. LIMITS OF LIABILITY AND RETENTION

Regardless of the number of **Insureds** under this Policy, **Claims** made or brought on account of **Wrongful Acts** or otherwise, the **Company's** liability is limited as follows:

A. The Limit of Liability specified in the Policy Declarations as "in the aggregate" shall be the maximum liability for **Loss** from all **Claims** to which this Policy applies.

B. The Limit of Liability specified in the Policy Declarations as the Limit for each **Claim** shall be the maximum liability for **Loss** for each **Claim** to which this Policy applies.

C. **Defense Costs** shall be in addition to the Limit of Liability shown in the Policy Declarations.

D. Subject to the Limits of Liability provisions stated in **A.**, **B.**, and **C.** above, the **Company** shall be liable to pay only **Defense Costs** and **Loss** in excess of the Retention specified in the Policy Declarations hereof as respects each and every **Claim** to which this Policy applies.

E. The **Company** shall have no obligation to pay any part or all of the Retention specified in the Policy Declarations for any **Claim** on behalf of an **Insured**. If the **Company**, at its sole discretion, elects to pay any part or all of the Retention, the **Insureds** agree to repay such amounts to the **Company** upon demand.

F. The Limit of Liability for the Extended Reporting Period, if applicable, shall be a part of and not in addition to the Limit specified in the Policy Declarations.

G. **Claims** based upon or arising out of the same **Wrongful Act**, interrelated **Wrongful Acts**, or a series of similar or related **Wrongful Acts** shall be considered a single **Claim** and shall be considered first made during the **Policy Period** or Extended Reporting Period, if applicable, in which the earliest **Claim** arising out of such **Wrongful Act(s)** was first made and all **Loss** for such **Claims** shall be subject to the one Limit of Liability that applies to such earliest **Claim**.

H. The Limit of Liability for this Policy shall apply separately to each consecutive annual period starting with the beginning of the **Policy Period** shown in the Policy Declarations. If this Policy is issued for a period of more than twelve (12) months but less than twenty four (24) months or if the **Policy Period** is extended after issuance, the additional Extended Reporting Period will be deemed part of the last **Policy Period** for the purposes of determining the Limit of Liability.

## VI. SPOUSAL AND DOMESTIC PARTNER EXTENSION

If a **Claim** against an **Individual Insured** includes a **Claim** against the lawful spouse or **Domestic Partner** of such **Individual Insured** solely by reason of (a) such spousal or **Domestic Partner** status or (b) such spouse's or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, any **Loss** which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which the **Individual Insured** becomes legally obligated to pay as a result of the **Claim**.

All definitions, exclusions, terms and conditions of this Policy, including the Retention, applicable to any **Claim** against, or **Loss** or **Defense Costs** sustained by, such **Individual Insured** shall also apply to this coverage extension.

The extension of coverage afforded by this Section VI shall not apply to the extent the **Claim** alleges any **Wrongful Act**, error, omission, misstatement, misleading statement, neglect or breach of duty committed by such spouse or

**Domestic Partner** as long as they are not also an **Individual Insured.**

## VII. EXTENDED REPORTING PERIOD

**A.** If the Policy expires, is cancelled or is non renewed for any reason other than non payment of premium, the **Parent Organization** shall have the right to purchase an Extended Reporting Period to report any **Claim**(s) or circumstance(s) which could be expected to give rise to a **Claim** being first made against an **Insured** during the twelve (12) months, twenty-four (24) months or thirty-six (36) months after the expiration date or effective date of such cancellation or non-renewal (depending upon the Extended Reporting Period purchased). An Extended Reporting Period shall only apply to a **Wrongful Act** committed before the date of the Policy expiration, cancellation or non-renewal. For the purpose of this clause, any change in premium terms or terms on renewal shall not constitute a refusal to renew.

**B.** The additional premium for the Extended Reporting Period shall be 50% of the annual premium set forth in the Policy Declarations for the twelve (12) month period; 100% of the annual premium set forth in the Policy Declarations for the twenty-four (24) month period; and 150% of the annual premium set forth in the Policy Declarations for the thirty-six (36) month period. The Extended Reporting Period begins on the expiration date or effective date of the cancellation or non-renewal of the Policy. The **Parent Organization** must notify the **Company** in writing and must pay the additional premium set forth above no later than thirty (30) days after the expiration date or effective date of such cancellation or non-renewal.

**C.** All premium paid with respect to an Extended Reporting Period shall be deemed fully earned as of the first day of the Extended Reporting Period.

**D.** The Limits of Liability available during the Extended Reporting Period shall not exceed the balance of the Limits of Liability available on the expiration date or effective date of the cancellation or non-renewal of the Policy.

**E.** Coverage for **Claim(s)**or circumstances which ultimately lead to a **Claim(s)** first received and reported during the Extended Reporting Period shall be excess over any other valid and collectible insurance providing coverage for such **Claim(s)**.

## VIII. DEFENSE AND SETTLEMENT

**A.** The **Insured** shall not demand or agree to arbitration of any **Claim** without the written consent of the **Company**. The **Insured** shall not, except at personal cost, make any offer or payment, admit any liability, settle any **Claim**, assume any obligation or incur any expense without the **Company's** written consent.

**B.** Except as otherwise provided in this Policy, if a **Claim** is made against an **Insured** for **Loss** that is both covered and uncovered by this Policy, the **Company** will pay one hundred percent (100%) of the **Defense Costs** for the **Claim** until such time that the Limits of Liability of this policy are exhausted by payment of a covered **Loss** or the **Claim** for the covered **Loss** is resolved by settlement, verdict or summary judgment.

**C.** The **Company**, as it deems expedient, has the right to investigate, adjust, defend, appeal and, with the consent of the **Insured**, negotiate the settlement of any **Claim** whether within or above the Retention. If the **Insured** refuses to consent to a settlement recommended by the **Company**, the **Company** is not obligated to pay any **Loss** or defend any **Claim** after the Limit of Liability has been exhausted by payment of **Loss** by settlement or otherwise. The **Company's** obligation to the **Insured** for **Defense Costs** and **Loss** attributable to such **Claim**(s) shall be limited to:
  **(1)** the amount of the covered **Loss** in excess of the Retention which the **Company** would have paid in settlement at the time the **Insured** first refused to settle;
  **(2)** plus covered **Defense Costs** incurred up to the date the **Insured** first refused to settle;
  **(3)** plus seventy five percent (75%) of covered **Loss** and **Defense Costs** in excess of the first settlement amount recommended by the **Company** to which the **Insured** did not consent.

It is understood that payment of **(1)**, **(2)** and **(3)** above is the limit of the **Company's** liability under this Policy for any **Claim** in which the **Insured** fails or refuses to consent to the **Company's** settlement recommendation, subject at all times to the Limits of Liability and Retention provisions of this Policy. The remaining twenty five percent (25%) of **Loss** and **Defense Costs** in excess of the amount referenced in (1) and (2) above shall be the obligation of the **Insured.**

**D.** The **Insured** agrees to cooperate with the **Company** on all **Claims**, and provide such

assistance and information as the **Company** may reasonably request. Upon the **Company's** request, the **Insured** shall submit to examination and interrogation by a representative of the **Company**, under oath if required, and shall attend hearings, depositions and trials and shall assist in the conduct of suits, including but not limited to effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, giving written statements to the **Company's** representatives and meeting with such representatives for the purpose of investigation and/or defense, all of the above without charge to the **Company**. The **Insured** further agrees not to take any action which may increase the **Insured's** or the **Company's** exposure for **Loss** or **Defense Costs**.

The **Insured** shall execute all papers required and shall do everything that may be necessary to secure and preserve any rights of indemnity, contribution or apportionment which the **Insured** or the **Company** may have, including the execution of such documents as are necessary to enable the **Company** to bring suit in the **Insured's** name and shall provide all other assistance and cooperation which the **Company** may reasonably require.

## IX. NOTICE/CLAIM AND CIRCUMSTANCE REPORTING PROVISIONS

Notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against any **Insured** shall be given in writing to the **Company**. If mailed, the date of mailing of such notice shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

**A.** As a condition precedent to exercising any right to coverage under this Policy, the **Insured** shall give to the **Company** written notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** as soon as practicable, but:
  **(1)** if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal; or
  **(2)** if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period.

**B.** If written notice of a **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** has

been given to the **Company** pursuant to Clause IX. **A.** above, then any **Claim** which is subsequently made against the **Insured** and reported to the **Company** alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** for which notice was given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** or circumstance which could be expected to give rise to a **Claim** being made against an **Insured** for which notice was given, shall be considered made at the time such notice was given.

## X. CANCELLATION OR NON-RENEWAL

**A.** This Policy may be canceled by the **Parent Organization** by either surrender of the Policy thereof to the **Company** at its address stated on the Policy Declarations or by mailing to the **Company** written notice requesting cancellation and in either case stating when thereafter such cancellation shall be effective. If canceled by the **Parent Organization**, the **Company** shall retain the customary short rate proportion of the premium.

**B.** The **Company** may cancel this Policy only in the event of the failure of the **Insured** to pay the premium when due by mailing to the **Parent Organization** written notice when, not less than ten (10) days thereafter, such cancellation shall be effective.

**C.** In the event the **Company** refuses to renew this Policy, the **Company** shall mail to the **Parent Organization**, not less than sixty (60) days prior to the end of the **Policy Period**, written notice of non-renewal. Such notice shall be binding on all **Insureds**.

**D.** The **Company** shall mail notice of Cancellation or Non-renewal by certificate of mailing stating the effective date of Cancellation or Non-renewal and the specific reason(s) for Cancellation or Non-renewal, which shall become the end of the **Policy Period**. Mailing of such notice shall be sufficient notice of Cancellation or Non-renewal.

**E.** If the Policy is canceled by the **Company**, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected, or as soon as practicable thereafter.

## XI. REPRESENTATIONS AND SEVERABILITY

**A.** The **Insured** represents that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of the Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Company**; and (3) the Policy is issued in reliance upon the truth of such representations.

**B.** An **Application** for coverage shall be construed as a separate **Application** for coverage by each **Individual Insured**. With respect to the particulars and statements contained in the **Application**, no fact pertaining to or knowledge possessed by any **Individual Insured** shall be imputed to any other **Individual Insured** for the purpose of determining if coverage is available. However, facts pertaining to and knowledge possessed by the individual(s) signing the **Application** and the President, Chairperson, Chief Executive Officer, Partner and Chief Financial Officer shall be imputed to the **Organization** for the purpose of determining if coverage is available.

## XII. SUBROGATION

In the event of any payment under this Policy, the **Company** shall be subrogated to the **Insured's** right of recovery therefore against any person or entity and the **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall not do anything to prejudice such rights.

## XIII CHANGES

Notice to any agent or knowledge by any agent shall not effect a waiver or change in any part of this Policy or stop the **Company** from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed except by an endorsement, issued by the **Company** to form a part of this Policy.

## XIV. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of all **Insureds** with respect to the giving and receiving of any return premiums that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the

**Parent Organization** in writing, at the address of the **Parent Organization**. Such notice shall be deemed to be notice to all **Insureds**. The **Parent Organization** shall be the agent of all **Insureds** to effect changes in the Policy or purchase the Extended Reporting Period.

## XV. ASSIGNMENT

Assignment of interest under this Policy shall not bind the **Company** unless its consent is endorsed hereon.

## XVI. OTHER INSURANCE

This Policy shall be excess of other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically written to be in excess of this Policy.

## XVII. TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of the State wherein this Policy is issued are hereby amended to conform to such statutes.

## XVIII. CHANGES IN EXPOSURE

**A.** If after the inception date of this Policy:

**(1)** the **Parent Organization** merges into or consolidates with another entity such that the **Parent Organization** is not the surviving entity; or
**(2)** another entity, person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Parent Organization**; or
**(3)** another entity, person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the directors of the **Parent Organization**; or
**(4)** the **Parent Organization** sells all or substantially all of its assets ,

the above events referred to as a "Transaction";

this Policy shall continue in full force and effect until the expiration date shown in the Policy Declarations or the effective date of non-renewal if applicable, with respect to **Wrongful Acts** occurring before the Transaction, but there shall be no coverage under this Policy for actual or alleged **Wrongful Acts** occurring on and after the Transaction. The entire premium for this Policy shall be deemed fully earned on the transaction date. In the event of a Transaction, the **Parent Organization** shall have the right to an offer of coverage by the **Company** for an Extended Reporting Period to report **Wrongful**

**Acts** occurring prior to the effective date of the Transaction.

**B.** The **Parent Organization** shall give the **Company** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

## XIX. ACTION AGAINST THE COMPANY

**A.** No action shall lie against the **Company** unless as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy, and until the amount of the **Insured's** obligation to pay shall have been finally determined either by judgment against the **Insured** after actual trial or by written agreement of the **Insured**, the claimant or the claimant's legal representative, and the **Company**.

**B.** Any person or the legal representatives thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy. No person or entity shall have any right under this Policy to join the **Company** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Company** be impleaded by the **Insured** or their legal representatives.

Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Company** of its obligations hereunder.

## XX. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

# INSURANCE

# POLICY

## UNITED STATES LIABILITY INSURANCE GROUP

A STOCK COMPANY

A BERKSHIRE HATHAWAY COMPANY

1190 Devon Park Drive
Wayne, PA 19087-2191
888-523-5545 – USLI.COM

This policy jacket together with the policy declarations, coverage forms and endorsements, if any, complete this policy.

The enclosed declarations designates the issuing company.

USLIPOL000051

# INSURANCE POLICY

# Read your policy carefully!

**In Witness Whereof**, the company has caused this Policy to be executed and attested.

Secretary

President

**EXHIBIT "D"**

Clerk of the Superior Court
*** Electronically Filed ***
C. Cuellar, Deputy
8/24/2021 11:28:12 AM
Filing ID 13288909

1  LUBIN & ENOCH, P.C.
Nicholas J. Enoch, State Bar No. 016473
Clara S. Acosta, State Bar No. 036044
2  William W. Holder, State Bar No. 009478
349 North Fourth Avenue
3  Phoenix, Arizona 85003-1505
Telephone: (602) 234-0008
Facsimile: (602) 626-3586
4  Email: nick@lubinandenoch.com

5  Attorneys for Plaintiffs

6  **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7  **IN AND FOR THE COUNTY OF MARICOPA**

8  Ana Jimenez Guadarrama, a married      ) No.      CV2021-013286
woman; Jose Eduardo Jimenez, a single   )
9  man; Manuel Najera Flores, a married man; )
Daniela Mundo Jimenez, a single woman;  )
10                                          )
                                         )
11            Plaintiffs,                  )
v.                                       ) **COMPLAINT**
12                                          )
                                         ) **Tier 2**
13  Green Fili, LLC, an Arizona Corporation; )
Rajen A. Patel, a single man; Jiten Sibal and )
14  Mamta Sibal, in their personal capacity as )
husband and wife and as trustees on behalf )
15  of the Sibal Family Trust; and John      )
"Harvey" Doe, a single man;              )
16                                          )
            Defendants.                  )

17        Plaintiffs, Ana Jimenez Guadarrama ("Guadarrama"), Jose Eduardo Jimenez

18  ("Jimenez"), Manuel Najera Flores ("Najera"), and Daniela Mundo Jimenez ("Mundo")

19  (collectively, the "Plaintiffs"), by and through their attorneys, Lubin & Enoch, P.C., bring

20  this action pursuant to, *inter alia*, the Fair Labor Standards Act of 1938, 29 U.S.C. § 201,

21  *et seq.* ("FLSA"), the Arizona Minimum Wage Act, A.R.S. § 23-362, *et seq.* ("AMWA"),

22

1

1  unlawful contract by requiring Plaintiffs to pay for employment, committed fraud, and

2  unjustly enriched themselves at the expense of Plaintiffs. Specifically, Plaintiffs allege as

3  follows:

4  ## THE PARTIES

5

6     2.    Guadarrama is a former employee of Defendants Green Fili, LLC, Rajen A.

7  Patel, Jiten Sibal, and John "Harvey" Doe (hereinafter "Harvey") (collectively referred to

8  as "Defendants"), from approximately August 2020 to March 2021.

   3.    Jimenez was Defendants' employee in May 2020 and from approximately

9  September 2020 to April 2021.

10     4.    Najera was Defendants' employee from approximately September 2020 to

11  March 2021.

12     5.    Mundo was Defendants' employee from approximately August 2020 to

13  March 2021.

14     6.    Defendant Jiten Sibal (hereinafter "Sibal") is a married man and resident of

15  Gilbert, Arizona. Sibal and his wife, Mamta Sibal, are now, and at all times relevant

16  hereto were, husband and wife, constituting a marital community under the laws of the

17  State of Arizona. Sibal engaged in acts and made omissions while performing as an agent

18  for the benefit of the marital community.

19     7.    Sibal is the owner of Filiberto's No. 72 where Plaintiffs worked.

20     8.    Defendant Rajen Patel ("hereinafter "Patel") is the sole individual member

21  of the corporate Defendant, Green Fili LLC.

22

3

USLI000122

1 | *See, e.g., Irwin Union Collateral Inc. v. Peters & Burris*, 2009 U.S. Dist. LEXIS 123393,

2 | 2009 WL 5184902, at *11 (D. Ariz. Dec. 22, 2009) ("The trustee, acting on behalf of the

3 | trust, signed these document [*sic*]. Because of this fact, it does not appear unfair to

4 | require that a lawsuit against the trust proceed against the trustee for the trust in her

5 | representative capacity").

6 |     19.    Upon information and belief, currently and during all relevant time periods,

7 | Patel has been a resident of Maricopa County, Arizona.

8 |     20.    Upon information and belief, currently and during all relevant time periods,

9 | Sibal has been a resident of Maricopa County, Arizona.

10 |     21.    Upon information and belief, currently and during all relevant time periods,

11 | Harvey has been a resident of Maricopa County, Arizona.

12 |     22.    Plaintiffs are former employees of Defendants as that term is defined in 29

13 | U.S.C. § 203(e)(1), A.R.S. § 23-362(A), and A.R.S. § 23-371(F).

14 |     23.    Defendants are Plaintiffs' former employers as that term is defined in 29

15 | U.S.C. § 203(d), A.R.S. § 23-362(B), and A.R.S. § 23-371(G).

16 |     24.    Upon information and belief, Sibal and Harvey exercised managerial

17 | responsibilities and substantial control over the terms and conditions of Plaintiffs' work.

18 | Among other things, Sibal and Harvey were primarily responsible for hiring and firing

19 | employees, supervising, and controlling employee work schedules and conditions of

20 | employment, determining the rate and method of payment, and maintaining any

21 | employment records that may exist.

22 |

5

1 | indirectly, by reason that one employer controls, is controlled, or is under control with the

2 | other employer. *Id.* at 1469-470 (citing 29 C.F.R. § 791.2(b)).

3 |     30.    Similarly, AMWA defines "employer" to "include[] any corporation,

4 | proprietorship, partnership, joint venture, limited liability company, trust, association,

5 | political subdivision of the state, individual or other entity acting directly or indirectly in

6 | the interest of an employer in relation to an employee..." A.R.S. § 23-362(B).

7 |     31.    Therefore, Defendants are "employers" as defined under the FLSA and

8 | AMWA. 29 U.S.C. § 203(d); A.R.S. § 23-362(B).

9 | **JURISDICTION AND VENUE**

10 |
11 |     32.    This Court has subject matter jurisdiction over this case pursuant to 29

12 | U.S.C. § 216(b), Ariz. Const. art. VI § 14, and A.R.S. §§ 12-123 and 23-364.

13 |     33.    This Court has personal jurisdiction over Defendants.

14 |     34.    Venue is proper in this Court pursuant to A.R.S. § 12-401.

15 | **GENERAL ALLEGATIONS**

16 | **The Contract**

17 |     35.    On or about August 28, 2020, Guadarrama and Najera signed a contract

18 | ("the Contract") with Sibal to be employed as managers of Filiberto's No. 72 (the

19 | "Restaurant"), located at 6187 West Chandler Boulevard, Chandler, Arizona 85226.

20 |
21 |
22 |

7

USLI000124

1   46.    There is a direct connection between Defendants' enrichment and
2   Plaintiffs' impoverishment.

3   47.    There is no justification for Defendants' enrichment and Plaintiffs'
4   impoverishment.

5   48.    If Plaintiffs do not prevail on their theory that the Contact violated the
6   Arizona Exactions of Fees as a Condition of Employment law, there is no remedy at law.

7                                      **Guadarrama**

8   49.    In preparation for her role as the food preparer at the Restaurant,
9   Guadarrama was required to complete two (2) to three (3) weeks of in-store training at
10  two (2) of Sibal's other Filibertos' restaurants: one located at 3610 W. Southern Avenue
11  and the other at 5220 W. Baseline Road. Guadarrama trained in August and September
12  2020 for approximately four (4) hours per day, five (5) days per week.

13  50.    Guadarrama did not receive any compensation for her training hours.

14  51.    The day prior to Guadarrama and Najera taking over management of the
15  Restaurant, Guadarrama and Mundo spent approximately twelve (12) hours cleaning the
16  Restaurant and rectifying health and safety hazards. They were not paid for this work.

17  52.    Guadarrama began working full time at the Restaurant on September 11,
18  2020. She was the only food preparer for the restaurant, which is open 24/7. In addition
19  to preparing the food for all shifts, she was responsible for cleaning the kitchen.

20  53.    From September 2020 to the first week of December 2020, Guadarrama
21  regularly worked five (5) days per week. Despite the Contract stating she would work
22  sixty (60) hours per week, she was scheduled for forty (40) hours per week and was paid

9

1    60.    Per the Contract, Guadarrama and Najera were also supposed to be paid a

2    commission based on monthly sales.

3    61.    Sibal, the owner, verbally told Guadarrama and Najera that they would

4    receive twenty percent (20%) of the sales in commission.

5    62.    Guadarrama and Najera did not receive information regarding monthly

6    sales to verify whether they were properly paid.

7    63.    From September 2020 to November 2020, Najera and Guadarrama were

8    required to split their commissions with the cashier manager, in violation of the Contract.

9    In those months, they received approximately one thousand seven hundred dollars

10   ($1,700.00) per month.

11   64.    On average, from December 2020 through February 2021, Harvey paid

12   Najera a lump sum between two thousand three hundred dollars ($2,300.00) and two

13   thousand four hundred dollars ($2,400.00) per month in cash for commission.

14   65.    Defendants did not pay Guadarrama and Najera their commission in March

15   2021.

16   66.    Guadarrama and Najera received a W2 for 2020, although the bonuses and

17   commission pay were not included as compensation in the W2.

18   67.    Guadarrama's paid sick time was tracked on her paystub; however,

19   Guadarrama's paystub did not reflect all the hours she worked and so the amount of paid

20   sick time listed on her paycheck did not properly reflect the amount of paid sick time she

21   had accrued.

22

11

USLI000126

1       73.     Throughout his employment from September 2020 to March 31, 2020,

2   Najera regularly worked seven (7) days per week and occasionally received one (1) day

3   off. However, there were two (2) to three (3) straight months where Najera worked every

4   day with no days off.

5       74.     Throughout his employment, Najera regularly worked ten (10) hours per

6   day.

7       75.     Approximately two times per week, Najera worked double shifts, adding an

8   average of twelve (12) to sixteen (16) hours to his average work week.

9       76.     From September 2020 to March 31, 2021, Najera worked an average of

10  eighty-two (82) to ninety (90) hours per week.

11      77.     Defendants paid Najera weekly with a check.

12      78.     Sibal told Najera that Defendants would pay him a salary of six hundred

13  and fifty dollars ($650.00) per week. Per the Contract, Najera's salary compensated him

14  for sixty (60) hours per week.

15      79.     Sibal told Najera that for any hours that Najera worked over sixty 60) in

16  one week, Defendants would pay Najera at the end of the month with a personal check

17  for each hour at then applicable rate of Arizona's minimum wage.

18      80.     At the end of September 2020, Defendants paid Najera two hundred eighty

19  eight dollars ($288.00). This additional payment for overtime hours was made the first

20  month he worked for Defendants but never again.

21      81.     Najera also received a bonus of one hundred sixty dollars ($160.00) at the

22

13

USLI000127

1    89.    From September 2020 to October 2020, Jimenez typically worked forty

2  (40) hours per week and was paid thirteen dollars and fifty cents ($13.50) per hour of

3  work.

4    90.    In October 2020, Harvey improperly reclassified Jimenez as a salaried

5  worker.  From October 2020 to April 2021, Jimenez was scheduled to work eight (8)

6  hour shifts, seven (7) days per week.

7    91.    In addition, once salaried, Jimenez was required to cover other employees'

8  shifts when they were absent, causing him to work back-to-back shifts to cover for absent

9  employees.

10    92.    Between October 2020 and December 2020, there were approximately

11  seven (7) days per month where Jimenez worked two (2) back-to-back shifts of eight (8)

12  hours each. Including the hours from the back-to-back shifts, Jimenez worked an average

13  work week of sixty (60) hours per week.

14    93.    Regardless of the hours he worked, beginning in October 2020, Defendants

15  paid Jimenez weekly with a check in the amount of six hundred twenty-four dollars

16  ($624.00) per week.  This salary was based upon minimum wage for fifty-six (56) hours

17  per week.

18    94.    Jimenez was not permitted or paid to take sick time off when he needed it.

19  Additionally, Jimenez's accrued paid sick time hours were not tracked on his paystub as

20  required by A.R.S. § 23-375.  On Jimenez's pay stub, the space next to "sick time" was

21  blank.

22

15

USLI000128

1       101.   At the first training store, Mundo was trained to pay employees' overtime

2   by evening out the cash register. This was done by taking an order or two off the record

3   by writing the order on a piece of paper and giving it to the chef. That way, the order was

4   not in the system, but the money from the purchase was in the cash register.

5       102.   In October 2020, Mundo started training for a manager position at a third

6   Filiberto's location. At this point, Mundo started receiving pay for her work.

7       103.   On or around November 11, 2020, Mundo started working for Defendants

8   as a cash register manager at the Restaurant.

9       104.   Mundo's job responsibilities included, but were not limited to, creating

10  schedules, submitting hours for payroll, hiring employees, covering employee shifts,

11  receiving checks, monitoring cleanliness, cleaning the bathroom and lobby, making

12  natural fruit waters, and packaging food. Mundo did not have the ability to change pay

13  rates or discipline employees.

14      105.   Harvey was Mundo's supervisor.

15      106.   During her first month at the Restaurant, Mundo was admonished for

16  payroll being too high. Harvey ordered her not to assign extra work to hourly workers if

17  it would result in them working overtime. To keep payroll down, Harvey and Sibal told

18  Mundo to reclassify the cooks as salaried employees and require them to work seven (7)

19  days per week to reduce labor costs.

20      107.   From November 2020 to March 2021, Mundo was scheduled to work ten

21  (10) hours per day, six (6) days per week and had Saturdays off. For this work, she was

22

17

1   115.   Mundo did not have the balance of her accrued sick time listed on her

2   paycheck, and she was not allowed to take paid sick time off as there were no employees

3   to cover for her.

4   116.   At times, Mundo paid employees for their overtime hours with cash from

5   the cash register because Harvey had told her that she was not allowed to pay employees

6   for their overtime hours given the limited payroll budget.

7   117.   When Mundo paid employees from the cash register, she would either take

8   an order off the record as she had been trained to do or would issue a refund to balance

9   the register.

10   118.   Mundo always used this money to pay other employees for their overtime

11   hours that would be unpaid otherwise. Mundo did not keep any of the money for herself.

12   119.   When Sibal discovered that Mundo had been paying employees this way,

13   he accused her of stealing ten thousand dollars ($10,000.00).

14   120.   Mundo has records showing that she took out three thousand two hundred

15   eighty-five dollars and eighty-three cents ($2,285.83) in refunds and voids.

16   121.   On March 27, 2021, Mundo stopped working at the Restaurant, ending her

17   employment with Defendants.

18   122.   During the relevant time period, Defendants did not provide the salaried

19   Plaintiffs with paid sick time off, and Defendants prevented the hourly Plaintiffs from

20   utilizing the benefit.

21   123.   Upon information and belief, Defendants have more than fifteen (15)

22   employees within the meaning of A.R.S § 23-372(A). Accordingly, Plaintiffs should have

19

1 | if fully set forth herein.

2 |     127.   The FLSA requires employers to pay employees at least the minimum wage
3 | rate as set by federal law. 29 U.S.C. § 206(a).

4 |     128.   At all times hereinafter mentioned, Defendants have been an employer within
5 | the meaning of 29 U.S.C. § 203(d).

6 |     129.   At all times hereinafter mentioned, Defendants have been an enterprise
7 | engaged in commerce or in the production of goods for commerce within the meaning of
8 | 29 U.S.C. § 203(s)(1), that has had employees engaged in commerce or in the production
9 | of goods for commerce, or employees handling, selling, or otherwise working on goods or
10 | materials that have been moved in or produced for commerce, or in any closely related
11 | process or occupation directly essential to the production thereof. Upon information and
12 | belief, Defendants' enterprise has had, and has, an annual gross volume of sales made or
13 | business done of no less than $500,000.00 (exclusive of excise taxes at the retail level
14 | which are separately stated).

15 |     130.   During the respective periods of Plaintiffs' employment by Defendants,
16 | Plaintiffs provided services for Defendants that involved interstate commerce for purposes
17 | of the FLSA.

18 |     131.   In performing the operations hereinabove described, Plaintiffs engaged in
19 | commerce within the meaning of 29 U.S.C. §§ 203(b), 203(i), 203(j), and 206(a).

20 |     132.   As a result of Defendants' pay policies, Plaintiffs were not compensated for
21 | the work they performed at a rate of hourly pay equal to or greater than the minimum set
22 | by federal law, thereby violating 29 U.S.C. §§ 206 and 215(a)(2).

21

1       140.   Moreover, Defendants knowingly, willfully, and with reckless disregard

2  carried out their illegal pattern of failing to pay Plaintiffs the proper amount of overtime

3  compensation. 29 U.S.C. §§ 207(a), 255(a).

4       141.   Defendants are sophisticated parties and employers, and therefore knew—or

5  should have known—that their pay policies violated the FLSA.

6       142.   The decisions and practices by Defendants to not pay the proper amount of

7  overtime for all hours worked were neither reasonable nor in good faith.

8       143.   Accordingly, Plaintiffs are entitled to be paid overtime wages for all hours

9  worked in excess of forty (40) hours per workweek pursuant to the FLSA in an amount

10  equal to one- and one-half times their regular rate of pay, plus liquidated damages,

11  attorneys' fees and costs.

12  **COUNT III: VIOLATION OF A.R.S.  § 23-363 AS AMENDED BY THE AMWA**
    ***(Failure to Pay the State Minimum Wage)***

13
        144.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as
14
   if fully set forth herein.
15
        145.   The AMWA requires employers to pay employees at least the minimum
16
   wage rate as set by state law. A.R.S. § 23-363.
17
        146.   At all times relevant to the Complaint, Defendants were employers within
18
   the meaning of A.R.S. § 23-362(B).
19
        147.   At all times hereinafter mentioned, Plaintiffs were employees within the
20
   meaning of A.R.S § 23-362(A).
21

22

23

155.   Defendants' illegal policy has caused Plaintiffs to work hours for which they were not compensated and, accordingly, they accumulated less paid sick time than was actually earned and at a slower rate.

156.   The Industrial Commission of Arizona requires employers to pay employees for "all hours worked." A.R.S. § 23-362; A.A.C. § R20-5-1206. By implication, Plaintiffs must accumulate paid sick time at a rate equivalent to "all hours worked." The FLSA's express reservation of the state's power to set standards higher than those required by the FLSA establishes a floor of protection which the states are free to build upon. 29 U.S.C. § 218(a); *see also Reyes*, 2013 U.S. Dist. LEXIS 192798, at *7. Therefore, the FLSA and applicable case law is persuasive authority for purposes of the AFWHFA to the extent it does not conflict with state law, specifically whether Plaintiffs suffered or were permitted to work.

157.   At all times relevant to the Complaint, Defendants have been an employer within the meaning of A.R.S. § 23-371(G).

158.   At all times hereinafter mentioned, Plaintiffs were employees within the meaning of A.R.S. § 23-371(F).

159.   Plaintiffs are entitled to recover the balance of the earned paid sick time owed, including interest thereon, and an additional amount equal to twice that amount owed pursuant to A.R.S § 23-364(G).

160.   Plaintiffs have suffered damages as a result of Defendants' illegal pay practices.

25

168.     Plaintiffs were employed by Defendants during the relevant time period and were covered employees entitled to the protections of A.R.S. § 23-374(A).

169.     Defendants' illegal policy preventing employees from taking earned paid sick time has caused Plaintiffs to take sick time for which they were not compensated.

170.     At all times relevant to the complaint, Defendants have been an employer within the meaning of A.R.S. § 23-371(G).

171.     At all times hereinafter mentioned, Plaintiffs were employees within the meaning of A.R.S. § 23-371(F).

172.     Plaintiffs have suffered damages as a result of Defendants' illegal pay practices.

173.     In violating the AFWHFA, Defendants acted willfully, without a good faith basis, and with reckless disregard of applicable Arizona law, and hence, a three-year statute of limitations applies to the commencement of this action. A.R.S. § 23-364(H).

174.     Plaintiffs now seek such compensation that was owed to them under A.R.S. § 23-374(A) plus liquidated damages, attorneys' fees, and costs.

### COUNT VI: VIOLATION OF 26 U.S.C. § 7434
*(Fraudulent Filing of Information Returns by Defendants)*

175.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

176.     Defendants willfully filed fraudulent information returns with respect to payments made to Plaintiffs in violation of 26 U.S.C. § 7434.

27

184.    Plaintiffs now seek to be repaid the twenty-thousand dollars ($20,000.00) that was unlawfully taken from them as a condition of their employment with Defendants, plus liquidated damages, attorneys' fees, and costs.

185.    Defendants are liable to Plaintiffs for all wages unpaid, together with reasonable attorneys' fees to be fixed by the court. The judgment shall also include compensation to Plaintiffs at the same rate at which the wages were agreed to be paid, from the time they became due until the judgement is satisfied. A.R.S. § 23-201(B).

186.    This judgment shall be a first and prior lien against the Restaurant, the property of Defendants upon which Plaintiffs performed labor. A.R.S. § 23-201(C).

187.    Obtaining labor under false pretenses is a class 1 misdemeanor. A.R.S. § 23-201(D).

### COUNT VIII: VIOLATION OF A.R.S. § 12-543, *et seq.*
*(Fraud)*

188.    Plaintiffs Guadarrama and Najera reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

189.    Defendants knowingly and willfully violated Arizona's common law on fraud. A.R.S. § 12-543.

190.    A showing of fraud requires a party to show: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance

29

1    **COUNT IX: ALTERNATIVE LEGAL THEORY: VIOLATION OF ARIZONA'S**
     **COMMON LAW ON UNJUST ENRICHMENT**
2    *(Unjust Enrichment)*

3    202.   Plaintiffs Guadarrama and Najera reallege and incorporate by reference the

4    forgoing paragraphs as if fully set forth herein.

5    203.   Defendants knowingly and unjustly enriched themselves in the amount of

6    twenty thousand dollars ($20,000.00).

7    204.   Plaintiffs Guadarrama and Najera were impoverished in the amount of

8    twenty thousand dollars ($20,000.00).

9    205.   There is a direct connection between Defendants' enrichment and

10   Plaintiffs Guadarrama's and Najera's impoverishment.

11   206.   There is no justification for Defendants' enrichment and Plaintiffs

12   Guadarrama's and Najera's impoverishment.

13   207.   In the absence of a finding that the Contract violated the Arizona Exactions

14   of Fees as a Condition of Employment law, there is no remedy at law for this violation.

15   *See, e.g., Hill v. Hill*, 185 Kan. 389, 345 P.2d 1015, 1025 (1959) ("The existence of a

16   remedy at law does not deprive equity of jurisdiction unless such remedy is clear,

17   adequate and complete").

18   208.   The Contract was unlawful.

19   209.   Defendants must make restitution to Plaintiffs Guadarrama and Najera.

20   *Harmon v. Harmon*, 126 Ariz. 242, 245, 613 P.2d 1298, 1301 (App. 1980) ("A person

21   who has been unjustly enriched at the expense of another is required to make restitution

22   to the other"); *see also, Loiselle v. Cosas Management Group, LLC*, 224 Ariz. 207, 210,

31

USLI000136

1       K.     Statutory penalties for a willful violation of 26 U.S.C. § 7434;

2       L.     Litigation costs pursuant to 29 U.S.C. § 216(b) and A.R.S. §§ 12-341 & 23-

3  364(G);

4       M.    An award of relief for willful fraud, pursuant to A.R.S. § 12-543(3);

5       N.     Restitution pursuant to Arizona's common law on unjust enrichment;

6       O.     In the event Defendants fail to satisfy any judgment for Plaintiffs, *to wit*,

7  against Defendants within ten (10) days of the Order becoming final, Defendants shall

8  pay Plaintiffs an amount which is treble the amount of the outstanding judgment with

9  interest thereon, in accordance with A.R.S. § 23-360;

10      P.     A declaratory judgment pursuant to the Uniform Declaratory Judgments

11  Act, A.R.S. § 12-1831, *et seq.,* that Defendants have violated their statutory and legal

12  obligations and deprived Plaintiffs of their rights, privileges, protections, compensation,

13  benefits, and entitlements under the law, as alleged herein; and

14      Q.    Such other legal and equitable relief, including punitive damages, as the

15  Court deems just.

16      RESPECTUFLLY SUBMITTED this 24th day of August, 2021.

17

18               LUBIN & ENOCH, P.C.

19             By:   /s/ Nicholas J. Enoch

20                   Nicholas J. Enoch, Esq.
                       Attorneys for Plaintiff

21  ///

22  ///

33

**EXHIBIT "E"**

Clerk of the Superior Court
*** Electronically Filed ***
M. De La Cruz, Deputy
11/2/2021 12:23:00 PM
Filing ID 13563327

1  LUBIN & ENOCH, P.C.
   Nicholas J. Enoch, State Bar No. 016473
   Clara S. Acosta, State Bar No. 036044
2  William W. Holder, State Bar No. 009478
   349 North Fourth Avenue
3  Phoenix, Arizona 85003-1505
   Telephone: (602) 234-0008
   Facsimile: (602) 626-3586
4  Email: nick@lubinandenoch.com

5  Attorneys for Plaintiffs

6          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

7              **IN AND FOR THE COUNTY OF MARICOPA**

8  Ana Jimenez Guadarrama, a married        )
   woman; Jose Eduardo Jimenez, a single    ) No. CV2021-013286
9  man; Manuel Najera Flores, a married man; )
   Daniela Mundo Jimenez, a single woman;   )
10 and Ana Maria Guadarrama Espinosa, a     )
   single woman,                            )
11                                          ) **FIRST AMENDED COMPLAINT**
                 Plaintiffs,                )
12                                          ) **Tier 2**
   v.                                       )
13                                          ) **(Assigned to the Honorable Pamela**
   Green Fili, LLC, an Arizona Corporation; ) **Gates)**
14 Rajen A. Patel, a single man; Jiten Sibal and )
   Mamta Sibal, in their personal capacity as )
15 husband and wife and as trustees on behalf )
   of the Sibal Family Trust; and John      )
16 "Harvey" Doe, a single man,              )
                                            )
17               Defendants.                )
                                            )

18        Plaintiffs, Ana Jimenez Guadarrama ("Guadarrama"), Jose Eduardo Jimenez

19 ("Jimenez"), Manuel Najera Flores ("Najera"), Daniela Mundo Jimenez ("Mundo")  and

20 Ana Maria Guadarrama Espinosa ("Espinosa") (collectively, the "Plaintiffs"), by and

21 through their attorneys, Lubin & Enoch, P.C., bring this action pursuant to, *inter alia*, the

22 Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.* ("FLSA"), the Arizona

                                        1

1   Minimum Wage Act, A.R.S. § 23-362, *et seq*. ("AMWA"), the Arizona Fair Wages and

2   Healthy Families Act, A.R.S. § 23-371, *et seq*. ("AFWHFA"), the Internal Revenue

3   Code, 26 U.S.C. § 7434 ("IRC"), the Arizona Exactions of Fees as a Condition of

4   Employment law, A.R.S. § 23-202, Arizona's common law on fraud, A.R.S. § 12-543, *et*

5   *seq*., and Arizona's common law on unjust enrichment. *See, e.g., Trustmark Ins. Co. v.*

6   *Bank One, Arizona, NA*, 202 Ariz. 535, 541, ¶ 31, 48 P.3d 485, 491 (App. 2002) ("Unjust

7   enrichment occurs when one party has and retains money or benefits that in justice and

8   equity belong to another").

9

10                            **INTRODUCTION**

11        1.       This lawsuit arises pursuant to the overtime and minimum wage sections of

the FLSA and the AMWA; the AFWHFA, the IRC; the Arizona Exactions of Fees as a

12  Condition of Employment law; Arizona's common law on fraud; and Arizona's common

13  law on unjust enrichment. The FLSA requires that any employee either directly engaged

14  in commerce or who works for an employer or enterprise engaged in commerce or in the

15  production of goods for commerce be paid the federal minimum wage and one- and one-

16  half times "the regular rate at which he is employed" for all hours worked in excess of

17  forty (40) hours in a given week. Plaintiffs were employees covered by the statute and

18  were required to work more than forty (40) hours in many weeks, yet were not paid the

19  overtime rate of pay for those hours nor were they paid the federal minimum wage. In

20  addition, Plaintiffs were not paid the minimum wage required by AMWA and FLSA, nor

21  did they properly accumulate paid sick time as required by AFWHFA. Defendants

22

                                      2

1  willfully filed fraudulent information returns. Lastly, Defendants willfully entered into an

2  unlawful contract by requiring Plaintiffs to pay for employment, committed fraud, and

3  unjustly enriched themselves at the expense of Plaintiffs. Specifically, Plaintiffs allege as

4  follows:

5  **THE PARTIES**

6

7  2.      Guadarrama is a former employee of Defendants Green Fili, LLC, Rajen A.

8  Patel, Jiten Sibal, and John "Harvey" Doe (hereinafter "Harvey") (collectively referred to

9  as "Defendants"), from approximately August 2020 to March 2021.

10  3.      Jimenez was Defendants' employee in May 2020 and from approximately

11  September 2020 to April 2021.

12  4.      Najera was Defendants' employee from approximately September 2020 to

13  March 2021.

14  5.      Mundo was Defendants' employee from approximately August 2020 to

15  March 2021.

16  6.      Espinosa was Defendants' employee from approximately February 2021 to

17  March 2021.

18  7.      Defendant Jiten Sibal (hereinafter "Sibal") is a married man and resident of

19  Gilbert, Arizona. Sibal and his wife, Mamta Sibal, are now, and at all times relevant

20  hereto were, husband and wife, constituting a marital community under the laws of the

21  State of Arizona. Sibal engaged in acts and made omissions while performing as an agent

22  for the benefit of the marital community.

3

USLI000086

1      8.      Sibal is the owner of Filiberto's No. 72 where Plaintiffs worked.

2      9.      Defendant Rajen Patel ("hereinafter "Patel") is the sole individual member

3   of the corporate Defendant, Green Fili LLC. Upon information and belief, Patel exercised

4   managerial responsibilities and substantial control over the terms and conditions of

5   Plaintiffs' work. Among other things, and upon information and belief, Patel was

6   primarily responsible for hiring and firing employees, supervising, and controlling

7   employee work schedules and conditions of employment, determining the rate and

8   method of payment, and maintaining any employment records that may exist.

9      10.     Defendant Harvey was Plaintiffs' supervisor at Filiberto's No. 72.

10     11.     Currently, and during all relevant time periods, Guadarrama has been a

11   resident of Maricopa County, Arizona.

12     12.     Currently, and during all relevant time periods, Jimenez has been a resident

13   of Maricopa County, Arizona.

14     13.     Currently, and during all relevant time periods, Najera has been a resident

15   of Maricopa County, Arizona.

16     14.     Currently, and during all relevant time periods, Mundo has been a resident

17   of Maricopa County, Arizona.

18     15.     Defendant Green Fili, LLC is an Arizona corporation organized under the

19   laws of the State of Arizona and regularly does business in Maricopa County, Arizona. Its

20   primary place of business is listed on the Arizona Corporation Commission site as being

21   2727 West Southern Avenue #5 Tempe, Arizona 85282.

22

4

USLI000087

1    16.    Upon information and belief, Green Fili LLC's annual dollar volume of

2    business is not less than $500,000.

3    17.    The Sibal Family Trust is an Arizona trust organized under the laws of the

4    State of Arizona and, as a member of Green Fili, LLC, regularly does business in

5    Maricopa County, Arizona.

6    18.    The Sibal Family Trust is located at 2992 East Camellia Drive, Gilbert

7    Arizona 85296 and is in the care of Sibal and Mamta Sibal.

8    19.    Sibal and Mamta Sibal are trustees of The Sibal Family Trust, and as

9    trustees, are liable to suit for the actions they conducted in their representative capacities.

10   *See, e.g., Irwin Union Collateral Inc. v. Peters & Burris*, 2009 U.S. Dist. LEXIS 123393,

11   2009 WL 5184902, at *11 (D. Ariz. Dec. 22, 2009) ("The trustee, acting on behalf of the

12   trust, signed these document [*sic*]. Because of this fact, it does not appear unfair to

13   require that a lawsuit against the trust proceed against the trustee for the trust in her

14   representative capacity").

15   20.    Upon information and belief, currently and during all relevant time periods,

16   Patel has been a resident of Maricopa County, Arizona.

17   21.    Upon information and belief, currently and during all relevant time periods,

18   the Sibals have been residents of Maricopa County, Arizona.

19   22.    Upon information and belief, currently and during all relevant time periods,

20   Harvey has been a resident of Maricopa County, Arizona.

21   23.    Plaintiffs are former employees of Defendants as that term is defined in 29

22   U.S.C. § 203(e)(1), A.R.S. § 23-362(A), and A.R.S. § 23-371(F).

5

USLI000088

1     24.     Defendants are Plaintiffs' former employers as that term is defined in 29

2     U.S.C. § 203(d), A.R.S. § 23-362(B), and A.R.S. § 23-371(G).

3     25.     Upon information and belief, Sibal, in his personal and trust capacity, and

4     Harvey exercised managerial responsibilities and substantial control over the terms and

5     conditions of Plaintiffs' work. Among other things, Sibal and Harvey were primarily

6     responsible for hiring and firing employees, supervising, and controlling employee work

7     schedules and conditions of employment, determining the rate and method of payment,

8     and maintaining any employment records that may exist.

9     26.     Harvey communicated policies, rules and pay rate changes to Najera and

10    Mundo, picked up invoices and cash from the register at the Restaurant, dropped off

11    employee paychecks, and reviewed employees' timesheets.

12    27.     At all times relevant to this proceeding, Sibal performed these employer

13    and managerial functions directly in the interest of himself and the corporate Defendant.

14    28.     While working for Defendants, Plaintiffs were "engaged in commerce" as

15    defined in the FLSA and corresponding regulations. 29 U.S.C. § 203 (b); *see also* 29

16    C.F.R. § 776.9 ("[i]t is clear that the employees covered by the wage and hour provisions

17    of the Act as employees 'engaged in commerce' are employees doing work involving or

18    related to the movement of persons or things . . . .").

19    29.     Plaintiffs were not exempt from receiving overtime as required by § 206(a)

20    of the FLSA.

21    30.     When more than one entity is an employer for purposes of the FLSA, the

22    entities are termed "joint employers." *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir.

6

1   1997) (internal page numbers omitted). "Joint employment should be defined expansively

2   under the FLSA." *Id.* at 639. All joint employers are individually responsible for

3   compliance with the FLSA. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465,

4   1469 (9th Cir. 1983) (citing 29 C.F.R. § 791.2(A)). The Department of Labor has stated

5   that a joint employment relationship exists when either (1) the employer acts directly or

6   indirectly in the interest of the other employers in relation to the employee; or (2) the

7   employers are not completely disassociated with respect to the employment of a

8   particular employee and may be deemed to share control of the employee, directly or

9   indirectly, by reason that one employer controls, is controlled, or is under control with the

10  other employer. *Id.* at 1469-470 (citing 29 C.F.R. § 791.2(b)).

11      31.     Similarly, AMWA defines "employer" to "include[] any corporation,

12  proprietorship, partnership, joint venture, limited liability company, trust, association,

13  political subdivision of the state, individual or other entity acting directly or indirectly in

14  the interest of an employer in relation to an employee…" A.R.S. § 23-362(B).

15      32.     Therefore, Defendants are "employers" as defined under the FLSA and

16  AMWA. 29 U.S.C. § 203(d); A.R.S. § 23-362(B).

17                      **JURISDICTION AND VENUE**

18      33.     This Court has subject matter jurisdiction over this case pursuant to 29

19  U.S.C. § 216(b), Ariz. Const. art. VI § 14, and A.R.S. §§ 12-123 and 23-364.

20      34.     This Court has personal jurisdiction over Defendants.

21      35.     Venue is proper in this Court pursuant to A.R.S. § 12-401.

22

                                7

USLI000090

## GENERAL ALLEGATIONS

### The Contract

36. On or about August 28, 2020, Guadarrama and Najera signed a contract ("the Contract") with Sibal to be employed as managers of Filiberto's No. 72 (the "Restaurant"), located at 6187 West Chandler Boulevard, Chandler, Arizona 85226.

37. Filiberto's is a fast-food chain restaurant that serves Mexican American food. Among other things, Filiberto's employees prepare, sell, and serve food that has traveled in interstate commerce.

38. Guadarrama, Najera, Jimenez, Mundo, and Jimena Monserrat (Mundo's sister) were present at the time Guadarrama and Najera signed the Contract.

39. On or about August 28, 2020, Guadarrama and Najera made a twenty-thousand-dollar ($20,000.00) deposit to Sibal as consideration for employment at the Restaurant.

40. Guadarrama repeatedly asked Sibal for a copy of the Contract affirming that she and Najera paid Sibal twenty-thousand dollars ($20,000.00), which he declined to do.

41. Sibal signed and gave Guadarrama a sticky note stating, "I received 20k from Manuel Najera for contract."

42. The Contract required that Guadarrama and Najera give Defendants a three (3) month notice if they wished to leave the Restaurant.

43. The Contract was unlawful under the Arizona Exactions of Fees as a

8

1  Condition of Employment law, A.R.S. § 23-202.

2      44.    Given its unlawfulness, the Contract is void and unenforceable.

3      45.    Defendants were enriched in the amount of twenty thousand dollars

4  ($20,000.00) as a result of the Contract.

5      46.    Plaintiffs were impoverished in the amount of twenty thousand dollars

6  ($20,000.00) as a result of the Contract.

7      47.    There is a direct connection between Defendants' enrichment and

8  Plaintiffs' impoverishment.

9      48.    There is no justification for Defendants' enrichment and Plaintiffs'

10  impoverishment.

11      49.    If Plaintiffs do not prevail on their theory that the Contact violated the

12  Arizona Exactions of Fees as a Condition of Employment law, there is no remedy at law.

13  **Guadarrama**

14      50.    In preparation for her role as the food preparer at the Restaurant,

15  Guadarrama was required to complete two (2) to three (3) weeks of in-store training at

16  two (2) of Sibal's other Filibertos' restaurants: one located at 3610 W. Southern Avenue

17  and the other at 5220 W. Baseline Road. Guadarrama trained in August and September

18  2020 for approximately four (4) hours per day, five (5) days per week.

19      51.    Guadarrama did not receive any compensation for her training hours.

20      52.    The day prior to Guadarrama and Najera taking over management of the

21  Restaurant, Guadarrama and Mundo spent approximately twelve (12) hours cleaning the

22

9

USLI000092

1    Restaurant and rectifying health and safety hazards. They were not paid for this work.

2        53.    Guadarrama began working full time at the Restaurant on September 11,

3    2020. Until February 2021, she was the only food preparer for the restaurant, which is

4    open 24/7. In addition to preparing the food for all shifts, she was responsible for

5    cleaning the kitchen.

6        54.    From September 2020 to the first week of December 2020, Guadarrama

7    regularly worked five (5) days per week. Despite the Contract stating she would work

8    sixty (60) hours per week, she was scheduled for forty (40) hours per week and was paid

9    as an hourly employee. She typically worked ten (10) to twenty (20) overtime hours per

10   week off the clock in order to complete the work required for a 24/7 restaurant.

11       55.    In one workweek, Guadarrama remained clocked in for all hours she

12   worked. Sibal was incensed that she had worked overtime on the clock, although he paid

13   her the overtime hours at the overtime rate. He stated that it was the last time she would

14   be paid overtime.

15       56.    With the exception of the one workweek mentioned, *supra*, Guadarrama

16   was not paid for anything for any of her overtime hours.

17       57.    Najera, the manager, told Guadarrama to work these overtime hours off the

18   clock because Sibal became angry when he had to pay workers overtime and Najera did

19   not want to lose his Contract.

20       58.    During the second week of December 2020, Harvey told Guadarrama and

21   Najera that they would no longer be eligible for overtime pay. In addition, Harvey

22   required Guadarrama to permanently add a sixth ten-hour workday to her schedule. The

10

1   ten (10) additional hours Guadarrama worked were paid to her at the straight time rate on

2   the paycheck of her husband and manager, Najera.

3       59.     From December 2020 to March 31, 2021, Guadarrama worked six (6) days

4   per week and approximately sixty (60) to seventy (70) hours per week for which she was

5   paid fifty (50) hours per week, all at the straight time rate.

6       60.     Defendants paid Guadarrama weekly with a check and she was paid at the

7   then-applicable Arizona minimum wage: twelve dollars ($12.00) per hour in 2020 and

8   twelve dollars and fifty cents ($12.50) in 2021.

9       61.     Per the Contract, Guadarrama and Najera were also supposed to be paid a

10  commission based on monthly sales.

11      62.     Sibal, the owner, verbally told Guadarrama and Najera that they would

12  receive twenty percent (20%) of the sales in commission.

13      63.     Guadarrama and Najera did not receive information regarding monthly

14  sales to verify whether they were properly paid.

15      64.     From September 2020 to November 2020, Najera and Guadarrama were

16  required to split their commissions with the cashier manager, in violation of the Contract.

17  In those months, they received approximately one thousand seven hundred dollars

18  ($1,700.00) per month.

19      65.     On average, from December 2020 through February 2021, Harvey paid

20  Najera a lump sum between two thousand three hundred dollars ($2,300.00) and two

21  thousand four hundred dollars ($2,400.00) per month in cash for commission.

22      66.     Defendants did not pay Guadarrama and Najera their commission in March

11

USLI000094

1    2021.

2    67.    Guadarrama and Najera received a W2 for 2020, although the bonuses and

3    commission pay were not included as compensation in the W2.

4    68.    Guadarrama's paid sick time was tracked on her paystub; however,

5    Guadarrama's paystub did not reflect all the hours she worked and so the amount of paid

6    sick time listed on her paycheck did not properly reflect the amount of paid sick time she

7    had accrued.

8    69.    Defendants did not have a policy or practice of permitting or paying

9    employees to take paid sick time. Guadarrama never asked for a sick day off when she

10   needed it, because, as the only food preparer, she would have to either make up the work

11   or it would fall on her husband, Najera, who could not do the work in addition to his own

12   duties.

13   70.    When they decided to end the Contract, Guadarrama and Najera gave three

14   months' notice, as required by the Contract. On March 31, 2021, one month after giving

15   notice, Guadarrama and Najera were replaced as managers, and they stopped working at

16   the Restaurant.

17                                    **Najera**

18   71.    On or around September 2020, Najera started working for Defendants as a

19   kitchen manager at the Restaurant. Najera had worked at Defendants' other restaurants

20   for approximately seven (7) years and was not required to undergo additional training.

21   72.    Najera's primary job responsibilities included, but were not limited to,

22   cleaning the kitchen, checking inventory, ordering food and other supplies, stocking the

12

USLI000095

1    kitchen with food, signing the invoices, and forwarding the invoices to Harvey for

2    payment. Najera also regularly covered others' jobs when an employee was absent, or a

3    position was vacant.

4       73.     Najera also had authority to hire kitchen staff within the numerical limits

5    given by Sibal and Harvey, discipline employees and change their schedules. He could

6    recommend pay rate changes or the termination of an employee to Sibal and Harvey but

7    could not act without their approval.

8       74.     Throughout his employment from September 2020 to March 31, 2020,

9    Najera regularly worked seven (7) days per week and occasionally received one (1) day

10    off. However, there were two (2) to three (3) straight months where Najera worked every

11    day with no days off.

12       75.     Throughout his employment, Najera regularly worked ten (10) hours per

13    day.

14       76.     Approximately two times per week, Najera worked double shifts, adding

15    an average of twelve (12) to sixteen (16) hours to his average work week.

16       77.     From September 2020 to March 31, 2021, Najera worked an average of

17    eighty-two (82) to ninety (90) hours per week.

18       78.     Defendants paid Najera weekly with a check.

19       79.     Sibal told Najera that Defendants would pay him a salary of six hundred

20    and fifty dollars ($650.00) per week. Per the Contract, Najera's salary compensated him

21    for sixty (60) hours per week.

22       80.     Sibal told Najera that for any hours that Najera worked over sixty (60) in

13

1    one week, Defendants would pay Najera at the end of the month with a personal

2    check for each hour at then applicable rate of Arizona's minimum wage.

3        81.    At the end of September 2020, Defendants paid Najera two hundred eighty

4    eight dollars ($288.00). This additional payment for overtime hours was made the first

5    month he worked for Defendants but never again.

6        82.    Najera also received a bonus of one hundred sixty dollars ($160.00) at the

7    end of every month.  This bonus was earned as an incentive for conserving, and not

8    wasting, supplies, cutlery, plates, napkins, and other inventory.

9        83.    In March 2021, Najera was not paid the monthly bonus of one

10   hundred sixty dollars ($160.00).

11       84.    When Najera asked Defendants for his March monthly bonus

12   and commissions, Defendants refused.

13       85.    Najera did not have the balance of his accrued sick time listed on his

14   paycheck, and he was not allowed to take paid sick time off as there were no employees

15   to cover for him, in violation of A.R.S. § 23-373(E).

16       86.    Defendants did not have a policy or practice of permitting or paying

17   employees to take paid sick time. Najera never asked for a sick day off when he needed

18   one because no other employees could replace him.

19       87.    Defendants would transfer employees from other Filiberto's locations to

20   cover shifts for those that called in sick.

21                                  **Jimenez**

22       88.    On or around May 2020, Jimenez completed approximately twenty (20)

14

1   hours of in-store training as a cashier at another Filiberto's location. Then, in September

2   2020 when he joined the Restaurant full-time, he worked for two (2) weeks,

3   approximately eighty (80) hours, unpaid as "training" to be a cook.

4       89.     As a cook, Jimenez's primary job responsibilities included, but were not

5   limited to, grilling, serving food, cleaning, and assisting with food preparation.

6       90.     From September 2020 to October 2020, Jimenez typically worked forty

7   (40) hours per week and was paid thirteen dollars and fifty cents ($13.50) per hour of

8   work.

9       91.     In October 2020, Harvey improperly reclassified Jimenez as a salaried

10  worker. From October 2020 to April 2021, Jimenez was scheduled to work eight (8) hour

11  shifts, seven (7) days per week.

12      92.     In addition, once salaried, Jimenez was required to cover other employees'

13  shifts when they were absent, causing him to work back-to-back shifts to cover for absent

14  employees.

15      93.     Between October 2020 and December 2020, there were approximately

16  seven (7) days per month where Jimenez worked two (2) back-to-back shifts of eight (8)

17  hours each. Including the hours from the back-to-back shifts, Jimenez worked an average

18  work week of sixty (60) hours per week.

19      94.     Regardless of the hours he worked, beginning in October 2020, Defendants

20  paid Jimenez weekly with a check in the amount of six hundred twenty-four dollars

21  ($624.00) per week.  This salary was based upon minimum wage for fifty-six (56) hours

22  per week.

15

1    95.    Jimenez was not permitted or paid to take sick time off when he needed it.
2  Additionally, Jimenez's accrued paid sick time hours were not tracked on his paystub as
3  required by A.R.S. § 23-375.  On Jimenez's pay stub, the space next to "sick time" was
4  blank.

5    96.    On January 7, 2021, Jimenez burnt his wrist with hot enchilada sauce
6  while working in the kitchen. Jimenez informed Harvey of his work injury. Jimenez's
7  injury required a hospital visit and he missed a day of work. Jimenez was not
8  compensated for the time he was out of work for his injury.

9    97.    On or around April of 2021, Jimenez stopped working at the Restaurant,
10  ending his employment with Defendants.

11                                    **Mundo**

12    98.    On or around August 16, 2020, Mundo attended an employee meeting with
13  Harvey, Najera, Guadarrama, Jimenez, and Jimena Monserrat, where they discussed the
14  required training and the dates when Najera and Guadarrama would be ready to manage
15  the Restaurant. Sibal gave Plaintiffs the menu, work uniforms, and applications.

16    99.    Mundo was required to undergo "training," *to wit,* working alone, for free,
17  at two (2) other Filiberto's locations – specifically, one located at 3610 W. Southern
18  Avenue and the other at 5220 W. Baseline Road – from on or about August 20, 2020 to
19  October 2020. She was trained as a cashier and was taught how to take orders and
20  package food.

21    100.   The training was four (4) to five (5) hours per day for five (5) to six (6)
22  days per week. Mundo trained for twenty (20) to thirty (30) hours per week for eight (8)

16

1 | weeks.

2 |     101.   Mundo was not paid anything for these training hours. During her

3 | "training," Mundo was used as a replacement when other employees were absent or a

4 | position was vacant.

5 |     102.   At the first training store, Mundo was trained to pay employees' overtime

6 | by evening out the cash register. This was done by taking an order or two off the record

7 | by writing the order on a piece of paper and giving it to the chef. That way, the order was

8 | not in the system, but the money from the purchase was in the cash register.

9 |     103.   In October 2020, Mundo started training for a manager position at a third

10 | Filiberto's location. At this point, Mundo started receiving pay for her work.

11 |     104.   On or around November 11, 2020, Mundo started working for Defendants

12 | as a cash register manager at the Restaurant.

13 |     105.   Mundo's job responsibilities included, but were not limited to, creating

14 | schedules, submitting hours for payroll, hiring employees, covering employee shifts,

15 | receiving checks, monitoring cleanliness, cleaning the bathroom and lobby, making

16 | natural fruit waters, and packaging food. Mundo did not have the ability to change pay

17 | rates or discipline employees.

18 |     106.   Harvey was Mundo's supervisor.

19 |     107.   During her first month at the Restaurant, Mundo was admonished for

20 | payroll being too high. Harvey ordered her not to assign extra work to hourly workers if

21 | it would result in them working overtime. To keep payroll down, Harvey and Sibal told

22 | Mundo to reclassify the cooks as salaried employees and require them to work seven (7)

17

USLI000100

1   days per week to reduce labor costs.

2      108.   From November 2020 to March 2021, Mundo was scheduled to work ten

3   (10) hours per day, six (6) days per week and had Saturdays off. For this work, she was

4   compensated weekly a set salary of seven hundred fifty dollars ($750.00) per week for

5   the sixty (60) hours that she regularly worked.

6      109.   For the first week or two in November 2020, no employee was available to

7   cover the Saturday shift, and so Mundo worked ten (10) hours per day for seven (7) days

8   per week.

9      110.   Mundo clocked in and out on the cash register at her scheduled start and

10   end time, not at the time that she actually entered and left.

11      111.   If an employee was sick, Mundo would cover for the employee in addition

12   to her regularly scheduled sixty (60) hours.

13      112.   When Mundo covered other employee's shifts, her extra hours were

14      generally paid at the end of the month in a separate paycheck at the straight time

15   rate of twelve dollars and fifty cents ($12.50) per hour. However, Mundo sometimes had

16   to wait one (1) or two (2) months to be paid for these extra hours.

17      113.   For the month of February 2021, there was no cashier for the "graveyard

18   shift" from 11:00 p.m. to 8:00 a.m. Throughout the entire month of February 2021,

19   Mundo worked her regular shift from 8:00 a.m. to 6:00 p.m., went home to rest, and then

20   worked again from 11:00 p.m. through the end of her shift the next day at 6:00 p.m. As a

21   result, Mundo received a warning for working more than one hundred (100) hours.

22      114.   Mundo also received a bonus of one hundred sixty ($160.00) dollars at the

18

USLI000101

1   end of every month as an incentive for not wasting supplies.

2       115.   In March 2021, Mundo did not receive the one hundred sixty dollar
3   ($160.00) bonus.

4       116.   Upon information and belief, Mundo's bonuses and hourly pay referenced
5   in ¶ 112 were not reported on the W2 she received.

6       117.   Mundo did not have the balance of her accrued sick time listed on her
7   paycheck, and she was not allowed to take paid sick time off as there were no employees
8   to cover for her.

9       118.   At times, Mundo paid employees for their overtime hours with cash from
10  the cash register because Harvey had told her that she was not allowed to pay employees
11  for their overtime hours given the limited payroll budget.

12      119.   When Mundo paid employees from the cash register, she would either take
13  an order off the record as she had been trained to do or would issue a refund to balance
14  the register.

15      120.   Mundo always used this money to pay other employees for their overtime
16  hours that would be unpaid otherwise. Mundo did not keep any of the money for herself.

17      121.   When Sibal discovered that Mundo had been paying employees this way,
18  he accused her of stealing ten thousand dollars ($10,000.00).

19      122.   Mundo has records showing that she took out three thousand two hundred
20  eighty-five dollars and eighty-three cents ($2,285.83) in refunds and voids.

21      123.   On March 27, 2021, Mundo stopped working at the Restaurant, ending her
22  employment with Defendants.

19

USLI000102

**Espinosa**

124.   On or around February 2021, Espinosa completed a week of training by Plaintiff Jimenez as a food preparer. Her training was unpaid and was approximately 18 hours.

125.   Espinosa began working part-time as a food preparer for Defendants in February 2021.

126.   Espinosa was scheduled to work 4:00 pm to 10:00 pm, Thursday through Sunday, for a total of eighteen (18) hours. On one occasion, she worked a fourth day in the week. Espinosa did not work overtime at Filiberto's.

127.   Espinosa was not paid for her first three (3) weeks of work, including the week she had worked a fourth day.

128.   Plaintiff was also not paid for her last week of work in March 2021.

129.   Defendants were aware that she had not been paid and although they had agreed to pay her for her hours worked, they did not.

130.   Espinosa was compensated $12.15 per hour.

131.   Paid sick time appeared on her paycheck but four weeks' worth of hours at the beginning of her employment had not been counted toward the accruing sick time balance.

132.   During the relevant time period, Defendants did not provide the misclassified salaried Plaintiffs with paid sick time off, and Defendants prevented the hourly Plaintiffs from utilizing the benefit.

133.   Upon information and belief, Defendants have more than fifteen (15)

20

1  employees within the meaning of A.R.S § 23-372(A). Accordingly, Plaintiffs should have

2  accrued one (1) hour of paid sick time for every thirty (30) hours worked, for a maximum

3  of forty (40) hours of earned paid sick time per year. Plaintiffs worked significantly more

4  than a sufficient number of hours to accrue a total of forty (40) hours of earned paid sick

5  time each year.

6      134.   Upon information and belief, Defendants were aware of their obligation to

7  pay the minimum wage and the proper amount of overtime for all hours worked in excess

8  of forty (40) hours each week but have failed to do so. This can be inferred by the fact

9  that Filibertos has been investigated by the federal Department of Labor and was found to

10 be in violation of minimum wage and overtime laws. Further, Defendants are engaged in

11 the operation of a sophisticated business.

12     135.   Upon information and belief, Defendants have failed to maintain the

13 required pay records pursuant to 29 U.S.C. § 211(c) and A.R.S. § 23-364(D). Defendants'

14 failure to maintain the required pay records raises a rebuttable presumption that

15 Defendants did not pay the required minimum and overtime premium. *See* A.R.S. § 23-

16 364(D); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946) (overruling a

17 circuit court requiring the employee to come forth with pay records and stating that the

18 burden is on employers to provide evidence of the precise amount of work to negate

19 employees' evidence of work performed).

20                          **CAUSES OF ACTION**

21                **COUNT I: VIOLATION OF THE FLSA**
   *(Failure to Pay Federal Minimum Wage as to Plaintiffs Guadarrama, Jimenez,*
22              *Mundo, and Espinosa Against All Defendants)*

                                21

136.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

137.   The FLSA requires employers to pay employees at least the minimum wage rate as set by federal law. 29 U.S.C. § 206(a).

138.   At all times hereinafter mentioned, Defendants have been an employer within the meaning of 29 U.S.C. § 203(d).

139.   At all times hereinafter mentioned, Defendants have been an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1), that has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce, or in any closely related process or occupation directly essential to the production thereof. Upon information and belief, Defendants' enterprise has had, and has, an annual gross volume of sales made or business done of no less than $500,000.00 (exclusive of excise taxes at the retail level which are separately stated).

140.   During the respective periods of Plaintiffs' employment by Defendants, Plaintiffs provided services for Defendants that involved interstate commerce for purposes of the FLSA.

141.   In performing the operations hereinabove described, Plaintiffs engaged in commerce within the meaning of 29 U.S.C. §§ 203(b), 203(i), 203(j), and 206(a).

142.   As a result of Defendants' pay policies, Plaintiffs were not compensated for

22

USLI000105

1   the work they performed at a rate of hourly pay equal to or greater than the minimum set

2   by federal law, thereby violating 29 U.S.C. §§ 206 and 215(a)(2).

3       143.   Moreover, Defendants knowingly, willfully, and with reckless disregard

4   carried out their illegal pattern of failing to pay Plaintiffs the proper amount of minimum

5   wage. 29 U.S.C. §§ 206(a), 255(a).

6       144.   Defendants are sophisticated parties and employers, and therefore knew—or

7   should have known—that their pay policies violated the FLSA.

8       145.   Plaintiffs now seek such compensation that was owed to them under 29

9   U.S.C. § 206, plus liquidated damages, attorneys' fees, and costs.

10   **COUNT II: VIOLATION OF THE FLSA**
     *(Failure to Pay Federal Overtime Wages as to Plaintiffs Guadarrama, Jimenez,*
11   *Najera, Mundo Against All Defendants)*

12       146.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

13   if fully set forth herein.

14       147.   The FLSA prohibits employers from employing their employees for a

15   workweek longer than forty (40) hours unless the employee receives compensation at not

16   less than one and one-half times the regular rate at which he or she is employed. 29 U.S.C.

17   § 207(a).

18       148.   At all relevant times, Plaintiffs were employees who were engaged in

19   commerce as required by 29 U.S.C. § 207.

20       149.   Defendants have violated 29 U.S.C. §§ 207 and 215(a)(2) by employing

21   Plaintiffs in an enterprise engaged in commerce within the meaning of the FLSA for

22   workweeks longer than forty (40) hours without compensating such non-exempt

23

1   employees for all the hours they worked in excess of forty (40) hours per week at rates at

2   least one and one-half times the regular rates for which they were employed.

3        150.    Moreover, Defendants knowingly, willfully, and with reckless disregard

4   carried out their illegal pattern of failing to pay Plaintiffs the proper amount of overtime

5   compensation. 29 U.S.C. §§ 207(a), 255(a).

6        151.    Defendants are sophisticated parties and employers, and therefore knew—or

7   should have known—that their pay policies violated the FLSA.

8        152.    The decisions and practices by Defendants to not pay the proper amount of

9   overtime for all hours worked were neither reasonable nor in good faith.

10       153.    Accordingly, Plaintiffs are entitled to be paid overtime wages for all hours

11  worked in excess of forty (40) hours per workweek pursuant to the FLSA in an amount

12  equal to one- and one-half times their regular rate of pay, plus liquidated damages,

13  attorneys' fees and costs.

14  **COUNT III: VIOLATION OF A.R.S. § 23-363 AS AMENDED BY THE AMWA**
    *(Failure to Pay the State Minimum Wage as to All Plaintiffs Against All Defendants)*

15
        154.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as
16
    if fully set forth herein.
17
        155.    The AMWA requires employers to pay employees at least the minimum
18
    wage rate as set by state law. A.R.S. § 23-363.
19
        156.    At all times relevant to the Complaint, Defendants were employers within
20
    the meaning of A.R.S. § 23-362(B).
21
        157.    At all times hereinafter mentioned, Plaintiffs were employees within the
22

                                        24

1  meaning of A.R.S § 23-362(A).

2      158.   The FLSA's express reservation of the state's power to set standards higher

3  than those required by the FLSA establishes a floor of protection which the states are free

4  to build upon. 29 U.S.C. § 218(a); *see also Reyes v. Lafarga*, No. CV-11-1998-PHX-SMM,

5  2013 U.S. Dist. LEXIS 192798, at *7 (D. Ariz. Nov. 20, 2013). Therefore, the FLSA and

6  applicable case law is persuasive authority for purposes of the AMWA to the extent it does

7  not conflict with state law, specifically whether Plaintiffs suffered or were permitted to

8  work.

9      159.   As a result of Defendants' pay policies, Plaintiffs were not compensated for

10  the work they performed at a rate of hourly pay greater than the minimum set by state law.

11      160.   Defendants willfully failed to pay Plaintiffs at least minimum wage in

12  violation of the AMWA, A.R.S. § 23-363.

13      161.   Plaintiffs now seek such compensation that was owed to them under A.R.S.

14  § 23-363, plus liquidated damages, attorneys' fees, and costs.

15                     **COUNT III: VIOLATION OF A.R.S. § 23-355**
         *(Failure to Pay Wages Owed as to Plaintiff Guaderrama, Jimenez, Mundo, and*
16                          *Espinosa Against All Defendants)*

17      162.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

18  if fully set forth herein.

19      163.   A.R.S. § 23-355(A) provides that if an employer fails to pay wages due any

20  employee, the employee may recover in a civil action against an employer or former

21  employer an amount that is treble the amount of the unpaid wages.

22      164.   At all times hereinafter mentioned, Plaintiffs were employees within the

USLI000108

1  meaning of A.R.S § 23-350(2).

2      165.  At all times relevant to the Complaint, Defendants were employers within

3  the meaning of A.R.S. § 23-350(3).

4      166.  Defendants willfully failed to pay Plaintiffs for hours worked, including but

5  not limited to, their hours worked for purposes of training and cleaning.

6      167.  Plaintiffs now seek such compensation that was owed to them under A.R.S.

7  § 23-355, plus liquidated damages, attorneys' fees, and costs.

8  **COUNT V: VIOLATION OF A.R.S. § 23-372 AS ESTABLISHED BY THE**
**AFWHFA**

9  *(Failure to Give Paid Sick Time as to All Plaintiffs Against All Defendants)*

10      168.  Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

11  if fully set forth herein.

12      169.  The AFWHFA requires that employees shall accrue at least one (1) hour of

13  earned paid sick time for every thirty (30) hours worked. A.R.S. § 23-372(B).

14      170.  Plaintiffs were employed by Defendants during the relevant time period and

15  were covered employees entitled to the protections of A.R.S. § 23-372(B).

16      171.  Defendants' illegal policy has caused Plaintiffs to work hours for which they

17  were not compensated and, accordingly, they accumulated less paid sick time than was

18  actually earned and at a slower rate.

19      172.  The Industrial Commission of Arizona requires employers to pay employees

20  for "all hours worked." A.R.S. § 23-362; A.A.C. § R20-5-1206. By implication, Plaintiffs

21  must accumulate paid sick time at a rate equivalent to "all hours worked." The FLSA's

22  express reservation of the state's power to set standards higher than those required by the

26

1   FLSA establishes a floor of protection which the states are free to build upon. 29 U.S.C. §

2   218(a); *see also Reyes*, 2013 U.S. Dist. LEXIS 192798, at *7. Therefore, the FLSA and

3   applicable case law is persuasive authority for purposes of the AFWHFA to the extent it

4   does not conflict with state law, specifically whether Plaintiffs suffered or were permitted

5   to work.

6        173.   At all times relevant to the Complaint, Defendants have been an employer

7   within the meaning of A.R.S. § 23-371(G).

8        174.   At all times hereinafter mentioned, Plaintiffs were employees within the

9   meaning of A.R.S. § 23-371(F).

10        175.   Plaintiffs are entitled to recover the balance of the earned paid sick time

11   owed, including interest thereon, and an additional amount equal to twice that amount owed

12   pursuant to A.R.S § 23-364(G).

13        176.   Plaintiffs have suffered damages as a result of Defendants' illegal pay

14   practices.

15        177.   Defendants are in possession and control of the necessary documents and

16   information from which Plaintiffs would be able to precisely calculate damages, *i.e.,*

17   timekeeping records.

18        178.   To the extent that Defendants also failed to maintain proper payroll records

19   showing the hours worked and earned paid sick time of Plaintiffs, there is a rebuttable

20   presumption that Defendants did not pay the required earned paid sick time. A.R.S. § 23-

21   364(D).

22        179.   Defendants are subject to a civil penalty of at least $250 for their first

27

1    violation and at least $1,000 for each subsequent and willful violation of the record keeping

2    requirements pursuant to A.R.S § 23-364(F).

3        180.    In violating the AFWHFA, Defendants acted willfully, without a good faith

4    basis, and with reckless disregard of applicable Arizona law, and hence, a three-year statute

5    of limitations applies to the commencement of this action. A.R.S. § 23-364(H).

6        181.    Plaintiffs now seek such compensation that was owed to them under A.R.S.

7    §§ 23-372 and 23-364(G), plus liquidated damages, attorneys' fees, and costs.

8    **COUNT VI: VIOLATION OF A.R.S. § 23-374(A) AS ESTABLISHED BY THE**
     **AFWHFA**
9    *(Systematic Denial of Paid Sick Time Rights as to Plaintiffs Jimenez and Mundo*
     *against All Defendants)*
10

11       182.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

     if fully set forth herein.
12

13       183.    The AFWHFA prevents employers from interfering with, restraining, or

     denying the exercise of paid sick time rights. A.R.S. § 23-374(A).
14

15       184.    Plaintiffs were employed by Defendants during the relevant time period and

     were covered employees entitled to the protections of A.R.S. § 23-374(A).
16

17       185.    Defendants' illegal policy preventing employees from taking earned paid

     sick time has caused Plaintiffs to take sick time for which they were not compensated.
18

19       186.    At all times relevant to the complaint, Defendants have been an employer

     within the meaning of A.R.S. § 23-371(G).
20

21       187.    At all times hereinafter mentioned, Plaintiffs were employees within the

     meaning of A.R.S. § 23-371(F).
22

28

1       188.    Plaintiffs have suffered damages as a result of Defendants' illegal pay

2    practices.

3       189.    In violating the AFWHFA, Defendants acted willfully, without a good faith

4    basis, and with reckless disregard of applicable Arizona law, and hence, a three-year statute

5    of limitations applies to the commencement of this action. A.R.S. § 23-364(H).

6       190.    Plaintiffs now seek such compensation that was owed to them under A.R.S.

7    § 23-374(A) plus liquidated damages, attorneys' fees, and costs.

8                        **COUNT VII: VIOLATION OF 26 U.S.C. § 7434**
     *(Fraudulent Filing of Information Returns by Defendants as to Plaintiffs Najera and*
9                        *Mundo Against Green Fili, LLC)*

10      191.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

11   if fully set forth herein.

12      192.    Defendant Green Fili, LLC willfully filed fraudulent information returns

13   with respect to payments made to Plaintiffs in violation of 26 U.S.C. § 7434.

14      193.    As a result of Defendant's unlawful acts, Plaintiffs are entitled to recovery

15   in an amount equal to the greater of $5,000 or the sum of any actual damages sustained by

16   Plaintiffs as a proximate result of the filing of a fraudulent information return, the costs of

17   the action, and reasonable attorneys' fees.

18                       **COUNT VIII: VIOLATION OF A.R.S. § 23-202**
     *(Unlawful Contract Requiring Plaintiffs to Pay Defendants for Employment as to*
19   *Plaintiffs Najera and Guadarrama against Defendants Green Fili, LLC, an Arizona*
     *Corporation and Jiten Sibal and Mamta Sibal, in their personal capacity as husband*
20   *and wife and as trustees on behalf of the Sibal Family Trust Sibal)*

21      194.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as

22   if fully set forth herein.

29

USLI000112

1    195.   The Arizona Exactions of Fees as a Condition of Employment law makes it

2    unlawful for an employer to "demand or receive, directly or indirectly...a fee, commission

3    or gratuity of any kind as the price or condition of the employment." A.R.S. § 23-202; *see,*

4    *e.g., Logan v. Forever Living Prods. Int'l, Inc.*, 52 P.3d 760 (Ariz. 2002).

5    196.   Defendants willfully required Plaintiffs Guadarrama and Najera to pay

6    Defendants twenty-thousand dollars ($20,000.00) as a condition of employment in

7    violation of A.R.S. § 23-202.

8    197.   At all times relevant to the Complaint, Defendants have been an employer

9    within the meaning of A.R.S. §§ 23-362(B) and 371(G).

10   198.   At all times hereinafter mentioned, Plaintiffs were employees within the

11   meaning of A.R.S. §§ 23-362(A) and 23-371(F).

12   199.   Plaintiffs have suffered damages as a result of Defendants' unlawful

13   contract.

14   200.   Plaintiffs now seek to be repaid the twenty-thousand dollars ($20,000.00)

15   that was unlawfully taken from them as a condition of their employment with Defendants,

16   plus liquidated damages, attorneys' fees, and costs.

17   201.   Defendants are liable to Plaintiffs for all wages unpaid, together with

18   reasonable attorneys' fees to be fixed by the court. The judgment shall also include

19   compensation to Plaintiffs at the same rate at which the wages were agreed to be paid, from

20   the time they became due until the judgement is satisfied. A.R.S. § 23-201(B).

21   202.   This judgment shall be a first and prior lien against the Restaurant, the

22   property of Defendants upon which Plaintiffs performed labor. A.R.S. § 23-201(C).

30

USLI000113

1    203.   Obtaining labor under false pretenses is a class 1 misdemeanor. A.R.S. § 23-

2  201(D).

3    **COUNT IX: VIOLATION OF A.R.S. § 12-543, *et seq.***
   ***(Fraud as to Plaintiffs Najera and Guadarrama Defendants Green Fili, LLC and Jiten***
4  ***Sibal and Mamta Sibal, in their personal capacity as husband and wife and as trustees***
   ***on behalf of the Sibal Family Trust Sibal)***

5
     204.   Plaintiffs Guadarrama and Najera reallege and incorporate by reference the
6
   foregoing paragraphs as if fully set forth herein.
7
     205.   Defendants knowingly and willfully violated Arizona's common law on
8
   fraud. A.R.S. § 12-543.
9
     206.   A showing of fraud requires a party to show: "(1) a representation; (2) its
10
   falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its
11
   truth; (5) the speaker's intent that it be acted upon by the recipient in the manner
12
   reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance
13
   on its truth; (8) the right to rely on it; and (9) his consequent and proximate injury."
14
   *Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500 (1982).
15
     207.   Defendants represented to Plaintiffs Guadarrama and Najera that
16
   Defendants would make Plaintiffs Guadarrama and Najera profit-sharing managers in
17
   exchange for twenty-thousand dollars ($20,000.00).
18
     208.   This representation was false.
19
     209.   This representation was material.
20
     210.   Defendants knew that this representation was false.
21
     211.   Defendants intended that Plaintiffs Guadarrama and Najera act on the false
22

31

USLI000114

1  representation and pay Defendants twenty-thousand dollars ($20,000.00).

2      212.  Plaintiffs Guadarrama and Najera did not know that the representation was

3  false.

4      213.  Plaintiffs Guadarrama and Najera relied on the representation being true.

5      214.  Plaintiffs Guadarrama and Najera justifiably relied on such a statement

6  coming from their employer.

7      215.  Plaintiffs Guadarrama and Najera were injured in the amount of twenty

8  thousand dollars ($20,000.00) as a direct result of Defendants' misrepresentation.

9      216.  Plaintiffs have suffered damages as a result of Defendants' fraud.

10      217.  Plaintiffs are entitled to recover all damages, including punitive damages,

11  and interest thereon, that they sustained as a result of Defendants' fraud, as well as

12  attorneys' fees and costs.

13  **COUNT X: ALTERNATIVE LEGAL THEORY: VIOLATION OF ARIZONA'S**
**COMMON LAW ON UNJUST ENRICHMENT**

14  *(Unjust Enrichment as to Najera and Guadarrama Defendants Green Fili, LLC and*
*Jiten Sibal and Mamta Sibal, in their personal capacity as husband and wife and as*

15  *trustees on behalf of the Sibal Family Trust Sibal)*

16      218.  Plaintiffs Guadarrama and Najera reallege and incorporate by reference the

17  forgoing paragraphs as if fully set forth herein.

18      219.  Defendants knowingly and unjustly enriched themselves in the amount of

19  twenty thousand dollars ($20,000.00).

20      220.  Plaintiffs Guadarrama and Najera were impoverished in the amount of

21  twenty thousand dollars ($20,000.00).

22      221.  There is a direct connection between Defendants' enrichment and

32

USLI000115

1   Plaintiffs Guadarrama's and Najera's impoverishment.

2        222.    There is no justification for Defendants' enrichment and Plaintiffs

3   Guadarrama's and Najera's impoverishment.

4        223.    In the absence of a finding that the Contract violated the Arizona Exactions

5   of Fees as a Condition of Employment law, there is no remedy at law for this violation.

6   *See, e.g., Hill v. Hill*, 185 Kan. 389, 345 P.2d 1015, 1025 (1959) ("The existence of a

7   remedy at law does not deprive equity of jurisdiction unless such remedy is clear,

8   adequate and complete").

9        224.    The Contract was unlawful.

10       225.    Defendants must make restitution to Plaintiffs Guadarrama and Najera.

11  *Harmon v. Harmon*, 126 Ariz. 242, 245, 613 P.2d 1298, 1301 (App. 1980) ("A person who

12  has been unjustly enriched at the expense of another is required to make restitution to the

13  other"); *see also, Loiselle v. Cosas Management Group, LLC*, 224 Ariz. 207, 210, 228 P.3d

14  943, 946 (App. 2010) ("A person is entitled to restitution if he mistakenly believes he is

15  party to a contract with another and makes payment to the other based on this mistake. *See*

16  Restatement § 15").

17                              **PRAYER FOR RELIEF**

18       Plaintiffs pray that they recover from Defendants the following:

19       A.    An award of unpaid overtime and minimum wages in an amount

20  appropriate to the proof adduced at trial pursuant to 29 U.S.C. §§ 206, 207, and 216(b);

21       B.    An award of liquidated damages regarding ¶ A *supra*, in an amount

22  appropriate to the proof adduced at trial pursuant to 29 U.S.C. § 216(b);

33

1    C.    An award of unpaid earned paid sick time in an amount appropriate to the

2    proof adduced at trial pursuant to A.R.S. § 23-364(G), including interest thereupon;

3    D.    An award of unpaid minimum wages in an amount appropriate to the proof

4    adduced at trial pursuant to A.R.S. § 23-363;

5    E.    An award of liquidated damages equal to twice the amount of unpaid

6    minimum wages pursuant to A.R.S. § 23-364(G);

7    F.    An award of liquidated damages equal to twice the amount of unpaid

8    earned paid sick time pursuant to A.R.S. § 23-364(G);

9    G.    An award of liquidated damages equal to treble the amount of unpaid

10   wages owed pursuant to A.R.S. § 23-355(A);

11   H.    Statutory penalties for a willful violation of A.R.S. § 23-364(F);

12   I.    Statutory penalties for a willful violation of A.R.S. § 23-201(A);

13   J.    Pre-judgment and post judgment interest on unpaid back wages pursuant to,

14   *inter alia*, A.R.S. § 23-364(G);

15   K.    Attorneys' fees pursuant to 29 U.S.C. § 216(b), A.R.S. § 23-364(G) A.R.S.

16   § 12-3401;

17   L.    Statutory penalties for a willful violation of 26 U.S.C. § 7434;

18   M.    Litigation costs pursuant to 29 U.S.C. § 216(b) and A.R.S. §§ 12-341 & 23-

19   364(G);

20   N.    An award of relief for willful fraud, pursuant to A.R.S. § 12-543(3);

21   O.    Restitution pursuant to Arizona's common law on unjust enrichment;

22   P.    In the event Defendants fail to satisfy any judgment for Plaintiffs, *to wit*,

34

1  against Defendants within ten (10) days of the Order becoming final, Defendants shall

2  pay Plaintiffs an amount which is treble the amount of the outstanding judgment with

3  interest thereon, in accordance with A.R.S. § 23-360;

4       Q.    A declaratory judgment pursuant to the Uniform Declaratory Judgments

5  Act, A.R.S. § 12-1831, *et seq.,* that Defendants have violated their statutory and legal

6  obligations and deprived Plaintiffs of their rights, privileges, protections, compensation,

7  benefits, and entitlements under the law, as alleged herein; and

8       R.    Such other legal and equitable relief, including punitive damages, as the

9  Court deems just.

10      RESPECTUFLLY SUBMITTED this 2nd day of November 2021.

11

12                     LUBIN & ENOCH, P.C.

13
              By:    /s/ Nicholas J. Enoch
14                   Nicholas J. Enoch, Esq.
                   Attorneys for Plaintiff

15

16                     **Tier Designation**

17      The amount of Plaintiffs' damages qualifies this matter as a Tier 2 case in

18  accordance with Rule 8(b)(2) of the Arizona Rules of Civil Procedure.

19                     LUBIN & ENOCH, P.C.

20
              By:    /s/ Nicholas J. Enoch
21                   Nicholas J. Enoch, Esq.
                   Attorneys for Plaintiff

22

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**Certificate of Service**

I hereby certify that on this 2nd day of November 2021, I electronically filed and transmitted the attached First Amended Complaint using the AZ-Turbo Court E-filing Online System.

/s/ Cristina Gallardo-Sanidad

36

USLI000119

Clerk of the Superior Court
*** Electronically Filed ***
C. Cuellar, Deputy
8/24/2021 11:28:12 AM
Filing ID 13288910

## In the Superior Court of the State of Arizona
## In and For the County of Maricopa

**Plaintiff's Attorneys:**
Nicholas J Enoch - Primary Attorney
Bar Number: 016473, issuing State: AZ
Law Firm: Lubin & Enoch PC
Lubin & Enoch P.c. 349 North Fourth Avenue
Phoenix, AZ 85003
Telephone Number: (602)234-0008
Email address: nick@lubinandenoch.com

Clara S. Acosta
Bar Number: 036044, issuing State: AZ
Law Firm: Lubin & Enoch PC
Telephone Number: (602)234-0008

William W. Holder
Bar Number: 009478, issuing State: AZ
Law Firm: Lubin & Enoch PC
Telephone Number: (602)234-0008

**Plaintiffs:**
Ana Jimenez Guadarrama
Lubin & Enoch P.c. 349 North Fourth Avenue
Phoenix, AZ 85003

Jose Eduardo Jimenez
Lubin & Enoch P.c. 349 North Fourth Avenue
Phoenix, AZ 85003

Manuel Najera Flores
Lubin & Enoch P.c. 349 North Fourth Avenue
Phoenix, AZ 85003

Daniela Mundo Jimenez
Lubin & Enoch P.c. 349 North Fourth Avenue
Phoenix, AZ 85003

CV2021-013286

AZturboCourt.gov Form Set #60233090

USLI000120

**EXHIBIT "F"**

 ❯ Docket

# Civil Court Case Information – Case History

## Case Information

| | | | |
|---|---|---|---|
| Case Number: | CV2021-013286 | Judge: | Viola, Danielle |
| File Date: | 8/24/2021 | Location: | Downtown |
| Case Type: | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Ana Jimenez Guadarrama | Plaintiff | Female | Nicholas Enoch |
| Jose Eduardo Jimenez | Plaintiff | Male | Nicholas Enoch |
| Manuel Najera Flores | Plaintiff | Male | Nicholas Enoch |
| Daniela Mundo Jimenez | Plaintiff | Female | Nicholas Enoch |
| Green Fili L L C | Defendant | | Pro Per |
| Rajen A Patel | Defendant | Unknown | Pro Per |
| Jiten Sibal | Defendant | Unknown | Pro Per |
| Mamta Sibal | Defendant | Unknown | Pro Per |
| Ana Maria Guadarrama Espinosa | Plaintiff | Female | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 11/3/2022 | RNM - Returned Mail | 11/3/2022 | |
| **NOTE:** | | | |
| 10/27/2022 | RNM - Returned Mail | 10/27/2022 | |
| **NOTE:** | | | |
| 10/27/2022 | RNM - Returned Mail | 10/27/2022 | |
| **NOTE:** | | | |
| 10/27/2022 | RNM - Returned Mail | 10/27/2022 | |
| **NOTE:** | | | |
| 9/27/2022 | 042 - ME: Case Dismissed - Full | 9/27/2022 | |
| 9/22/2022 | NDI - Notice Of Dismissal | 9/24/2022 | |
| **NOTE:** Notice of Voluntary Dismissal with Prejudice | | | |
| 8/11/2022 | RNM - Returned Mail | 8/11/2022 | |
| **NOTE:** | | | |
| 8/11/2022 | RNM - Returned Mail | 8/11/2022 | |
| **NOTE:** | | | |
| 8/11/2022 | RNM - Returned Mail | 8/11/2022 | |
| **NOTE:** | | | |
| 8/4/2022 | RNM - Returned Mail | 8/4/2022 | |
| **NOTE:** | | | |
| 7/6/2022 | 375 - Case on Dismissal Calendar | 7/6/2022 | |
| 6/30/2022 | NOS - Notice Of Settlement | 7/1/2022 | |
| **NOTE:** Notice of Settlement | | | |
| 5/18/2022 | 375 - Case on Dismissal Calendar | 5/18/2022 | |
| 11/16/2021 | AFS - Affidavit Of Service | 11/22/2021 | |
| **NOTE:** RAJEN A PATEL | | | |
| 11/15/2021 | AFS - Affidavit Of Service | 11/20/2021 | |
| **NOTE:** GREEN FILI LLC | | | |
| 11/15/2021 | AFS - Affidavit Of Service | 11/20/2021 | |
| **NOTE:** MAMTA SIBAL | | | |
| 11/15/2021 | AFS - Affidavit Of Service | 11/20/2021 | |
| **NOTE:** JITEN SIBAL | | | |

| 11/3/2021 | 322 - ME: Notice Of Intent To Dismiss | 11/3/2021 |
| 11/2/2021 | AMC - Amended Complaint | 11/3/2021 |
| **NOTE:** First Amended Complaint | | |
| 8/24/2021 | COM - Complaint | 8/24/2021 |
| **NOTE:** Complaint | | |
| 8/24/2021 | CSH - Coversheet | 8/24/2021 |
| **NOTE:** Civil Cover Sheet | | |
| 8/24/2021 | CCN - Cert Arbitration - Not Subject | 8/24/2021 |
| **NOTE:** Certificate Of Compulsory Arbitration - Is Not Subject To | | |
| 8/24/2021 | SUM - Summons | 8/24/2021 |
| **NOTE:** Summons | | |
| 8/24/2021 | SUM - Summons | 8/24/2021 |
| **NOTE:** Summons | | |
| 8/24/2021 | SUM - Summons | 8/24/2021 |
| **NOTE:** Summons | | |
| 8/24/2021 | SUM - Summons | 8/24/2021 |
| **NOTE:** Summons | | |

## Case Calendar

**There are no calendar events on file**

## Judgments

**There are no judgments on file**

**EXHIBIT "G"**



1001 North Central Avenue, Suite 660
Phoenix, Arizona 85282
Phone: (602) 254-6010
Fax: (602) 254-6352
Brm@merchantlawaz.com
www.merchantlawaz.com

April 11, 2022

***Sent Via Email Only to mrubin@usli.com***

Matthew Rubin, Assistant Vice President
Coverage Specialist
United States Liability Insurance Company
P.O. Box 6700
Wayne, Pennsylvania 19087

|     | Re: | Insured: | USA Truck Center, LLC |
|-----|-----|----------|----------------------|
|     |     | Expanded Definition of Insured: | Green Fili LLC |
|     |     | Policy No.: | EPL1559591E |
|     |     | Claim No.: | 0-13772 |
|     |     | Claimants: | Ana Jimenez Guadarrama, et al. |

Dear Mr. Rubin:

     Thank you again for taking the time to speak with me this morning.  As we discussed, I have reviewed the letter you sent of even date herewith and this letter will acknowledge our telephone conversation this morning concerning United States Liability Insurance Company's ("USLI") denial of coverage on this claim.

     As was discussed, my client, Green Fili LLC ("Green Fili") received notification of the lawsuit filed by Guadarrama, et al. (the "Lawsuit") in or around September 2021. Upon service of the Lawsuit, Green Fili notified my firm.  Upon notification, this firm reached out to opposing counsel in an effort to resolve the matter.  Rather than involve insurance, the thought was, even though Green Fili believed it would prevail on the merits, to avoid further expense and time we would attempt resolution.

     To that end, this firm sought and obtained an extension from opposing counsel to respond to the Lawsuit.  This is important as the "Claim" had not fully matured.  As you will see, the Lawsuit complaint is more general in terms of damages.  Unfortunately, it took Plaintiffs' counsel several months to send a more exhaustive damages calculation to my office. It was not until March 29, 2022 wherein Plaintiffs' attorney sent a letter asking

USLI000229

Matthew Rubin
United States Liability Insurance Company
April 11, 2022
Page 2

for an egregiously high amount.  A Notice of Claim ("Notice") was immediately filed the following day on March 30, 2022 with USLI.

Although you stated in our conversation that our client surpassed the Reporting Period, you are using the wrong standard.  The only standard that applies is: "**as soon as practicable**," which as is stated herein, was reported practicably. Policy EPL1559591E states the following:

> 1.   As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim**, as soon as practicable . . .

The word in the Policy, "practicable," means attainable or feasible.  As indicated, Green Fili made numerous attempts to resolve this matter before reporting it to USLI, offering the claimants substantially more money than they were entitled to under the circumstances, but opposing counsel insisted the offers were insufficient.  Practicability is a vague term and should be construed in its broadest sense so not to prejudice any party.  Green Fili worked to avoid filing any claim under its Policy, which was to USLI's benefit and to Green Fili's detriment.  Thus, based on the wording of the Policy, Green Fili did submit its Notice in a timely and practicable manner, one day after claimants' final, unacceptable settlement counteroffer.

In your letter and on our telephone call, you insisted that the Green Fili was required to provide notice of the Lawsuit within sixty (60) days of January 8, 2022.  As the basis for this rationale you cite the following section:

> (b)   if the Policy expires, is cancelled or non-renewed and if no Extended or Reporting period is purchased, no later than sixty (60) days after the expiration date or effective date of such cancellation or non-renewal. . . .

However, what this fails to account for is the fact that the Policy was automatically renewed prior to the expiration date.  The language cited clearly states that notice must be within sixty (60) days if the Policy "expires, is cancelled or non-renewed."  In this case, the Policy did not expire nor was it cancelled and, in fact, it was timely renewed, i.e., there was no lapse whatsoever.  Therefore, this section is not even applicable because of the fact that it was renewed.  Had it expired or was not-renewed then clearly they would have had to report the Lawsuit within sixty (60) days.  In fact, the sixty (60) days is intended to serve as a grace period for insureds that cancel or do not renew.  In this case,

USLI000230

Matthew Rubin
United States Liability Insurance Company
April 11, 2022
Page 3

Green Fili did timely renew.  Had the intent of the policy language been to not cover insureds that renew, the language would not have included "or non-renewed."

I reviewed your email in which you sent me the case *Supima v. Philadelphia Indemnity Insurance Company*, 2021 WL 2454052 (D.Ct. 2021).  That case is clearly distinguishable in the fact that our client and your continued insured made every effort not to involve USLI by taking the brunt of the costs associated with a settlement as opposed to submitting a Notice for coverage.  Green Fili attempted to resolve the claim earlier but opposing counsel continued to delay such that when he did finally produce an unreasonable counteroffer, Green Fili submitted a Notice the next day, not three policy periods later as in *Supima*.  Additionally, in the Supima case, notice was submitted well after arbitration had commenced.  In which case it is completely reasonable to deny coverage as legal strategies had been develop and theories had been argued.  In this case, a responsive pleading to the Lawsuit has yet to be filed.

As I indicated in our telephone call, Green Fili has had the same policy in effect with USLI for several years.  Each year, the Policy automatically renews.  While USLI internally changes the letter at the end of the policy with each successive year, the policy is not a new policy altogether.  It is simply a renewal of the same policy.  For this particular policy renewal, there was absolutely no changes to the scope and/or characteristics of the Policy.  To state otherwise is simply a bad faith tactic to avoid coverage to a long-term and loyal client.

**USLI has a responsibility to provide coverage to Green Fili, plain and simple. Any other decision would be considered bad faith.**

Green Fili requests you reconsider USLI's coverage denial.  Should USLI continue to refuse coverage to Green Fili, Green Fili will have no other option than to file suit for bad faith.  As I mentioned, time is of the essence in this matter.  Please respond within 24 hours of your receipt of same.

Sincerely,

**MERCHANT LAW FIRM PLLC**

Bimal R. Merchant
for the Firm

BRM/ef
cc:    Client

**EXHIBIT "H"**



April 11, 2022

Raj Patel
USA Truck Center, LLC
9831 S. 51st Street, Ste. D134
Phoenix, AZ  85044

**VIA EMAIL at** raj85008@gmail.com

RE:    Claimant:                    Ana Jimenez Guadarrama, et al.

| | |
|---|---|
| Claimant: | Ana Jimenez Guadarrama, et al. |
| Claim Number: | 0-13772 |
| Reported Date of Loss: | 3/30/2022 |
| Date Received: | 3/30/2022 |
| Insured: | USA Truck Center, LLC |
| Expanded Definition of Insured: | Green Fili, LLC |
| Retroactive Date: | 1/6/2016 |
| Policy Number: | EPL1559591F |
| Policy Effective Dates: | 1/8/2022 – 1/8/2023 |
| Issuing Company: | United States Liability Insurance Company |

Dear Raj Patel:

United States Liability Insurance Company ("this Company") acknowledges receipt of the First Amended Complaint filed by Ann Jimenez Guadarrama against you and Green Fili, LLC on November 2, 2021. We also confirm issuing the above-referenced Employment Practices Liability Policy ("the Policy"). We regret to inform you there is no coverage, either defense or indemnification, under the Policy for this matter.

Without delving into the substance of Ms. Guadarrama's First Amended Complaint, Ms. Guadarrama filed her original Complaint on August 24, 2021. You confirmed in an email to Andrea Dulac that you and Green Fili, LLC received notice of Ms. Guadarrama's Complaint in September of 2021 and hired counsel to respond. Ms. Guadarrama filed her First Amended Complaint on November 2, 2021 and then filed an Affidavit of Service on November 15, 2021.

Bearing the foregoing in mind, please refer to paragraph A of the Insuring Agreement of the Policy, as amended by the EPL-169 (11-13) Amended Notice/Claim and Circumstance Reporting Provisions endorsement, which reads:

> A.    The **Company** will pay on behalf of the **Insured, Loss** in excess of the Retention not exceeding the Limit of Liability shown on the policy Declarations for which this coverage applies that the **Insured** shall become legally obligated to pay because of **Claims** first made against the **Insured** during the Policy Period or during any Extended Reporting Period, if applicable, for **Wrongful Acts** arising solely out of an **Insured's** duties on

BERKSHIRE HATHAWAY COMPANIES

1190 DEVON PARK DRIVE • P.O. BOX 6700 • WAYNE, PA 19087 • 610-688-2535 • 888-523-5545 • FAX 610-688-4391

United States Liability Insurance Company • Mount Vernon Fire Insurance Company • U.S. Underwriters Insurance Company
Mount Vernon Specialty Insurance Co. • Radnor Specialty Insurance Co.

USLI.COM • DEVONPARKSPECIALTY.COM

Raj Patel
0-13772
April 11, 2022
pg. 2

behalf of the **Organization**. Such **Claim** must be reported to the **Company** in accordance with Section IX herein.

"Claim" is defined in the DEFINITIONS section of the Policy, on page one of the EPLJ (09-07) policy form, as follows:

> B.    "**Claim**" means:
>
> (1)    any written notice received by any **Insured** that any person or entity intends to hold such **Insured** responsible for a **Wrongful Act**, or
>
> (2)    any proceeding initiated against any **Insured,** including any appeal therefrom, seeking to hold such **Insured** responsible for a **Wrongful Act**, including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal, state or local agency, and any appeal therefrom;
>
> A **Claim** shall be considered first made when the **Insured** or its legal representative or agent first receives notice of a **Claim**.

The Policy is a "Claims Made and Reported" policy that provides coverage only for claims "first made during the Policy Period". As is noted in the caption of this letter, the Policy incepted on January 8, 2022, and the Policy Period began on that date. Ms. Guadarrama first brought her "Claim" against Green Fili, LLC when Green Fili, LLC received notice of her original Complaint in September of 2021. Per the Court's docket, Green Fili, LLC was also served with her First Amended Complaint on or before November 15, 2021. Thus, Ms. Guadarrama's "Claim" was first made against Green Fili, LLC on or before November 15, 2021, prior to the inception of the Policy and it was not "first made during the Policy Period". Therefore, there is no coverage under the Policy for her "Claim".

To the extent you might inquire if coverage exists under policy EPL1559591E, effective from January 8, 2021 to January 8, 2022, and which was in force at the time Green Fili, LLC first received notice of Ms. Guadarrama's claim, please refer to the Notice/Claim Reporting Requirements section of that policy, as modified by the Amended Notice/Claim and Circumstance Reporting Provisions endorsement, which reads:

> A.    **Written Notice of a Claim:**
>
> **(1)**    As a condition precedent to exercising any right to coverage under this Policy, an **Insured** shall give to the **Company** written notice of a **Claim,** as soon as practicable but:
>
> **(a)**    if the Policy expires, is cancelled or is non-renewed and if no Extended Reporting Period is purchased, no later than sixty (60)

USLI000226

Raj Patel
0-13772
April 11, 2022

pg. 3

days after the expiration date or effective date of such cancellation or non-renewal. Coverage for a **Claim** reported to the **Company** during the sixty (60) day period after expiration, cancellation or non-renewal applies only if the **Claim** is first made against an **Insured** prior to the Policy expiration or effective date of cancellation or non-renewal; or

> **(b)**    if an Extended Reporting Period is purchased, no later than the last day of the Extended Reporting Period;

Like the Policy, policy EPL1559591E is a "Claims Made and Reported" policy that provides coverage for claims "first made during the Policy Period" provided that those claims are also reported within 60 days after the expiration of that policy. As a condition precedent to coverage, Green Fili, LLC was required to report any claim made against it "as soon as practicable" and in no event "later than sixty (60) days after the expiration date" of the policy in which the "Claim" was made. Because Ms. Guadarrama first made her "Claim" while policy EPL1559591E was in force, Green Fili, LLC was required to report her "Claim" by March 9, 2022. However, Green Fili, LLC did not report her "Claim" to this Company until March 30, 2022, 81 days after the expiration of policy EPL1559591E. Thus, Green Fili, LLC failed to report Ms. Guadarrama's "Claim" within 60 days after the expiration of policy EPL1559591E, thereby breaching a condition precedent to coverage under that policy and negating any coverage that might have otherwise existed under policy EPL1559591E for her claim.

For the reasons stated above, neither the Policy nor policy EPL1559591E provides coverage for this matter. This determination is based upon all information available to me at this time. If you have additional information or legal authority that you believe may affect the Company's position regarding coverage for this claim, or you obtain such information or authority in the future, I would be happy to review the same at any time. There may be other reasons for which coverage does not exist for this matter, and the failure to enumerate each and every potential ground for a coverage denial does not mean that the Company has waived any rights under the Policy. The Company's position may be subject to change if additional facts and legal theories are developed and we reserve all of our rights under the Policy.

If you have questions or disagree with the decision communicated in this letter, please contact me via email at mrubin@usli.com or by phone at (610) 902-9515.

Sincerely,

Matthew Rubin
Assistant Vice President
Coverage Specialist

Raj Patel
0-13772
April 11, 2022
pg. 4

Cc:    Brett Nelson
        Via email at brett-nelson@leavitt.com

USLI000228